CASE 46.—ACTION BY HARRY SPINKS AGAINST THE
UNITED STATES LIFE INS. CO. OF N. Y. ON A
POLICY OF LIFE INSURANCE ON THE LIFE OF HIS
FATHER.—October 19, 1906.

# United States Life Ins. Co. v. Spinks

Appeal from Campbell Circuit Court.

JOHN T. HODGE AND A. S. BERRY, Successive Judges.

Judgment for plaintiff.    Defendant appeals.—Affirmed.

1.  Insurance—Mutual    Insurance    Companies—Surplus—Lapsed
    Policy.—The "surplus" of a mutual life insurance company
    belongs equitably to the policy holders who contributed to
    it in the proportion in which they contributed to it. Under
    Sec. 88, c. 690, p. 1869, Laws 1892, of New York, the share of
    a policy lapsed for nonpayment of premium (after having
    been in force three years) must be applied to the purchase
    of extended insurance unless ·the policy holder has elected
    to take paid-up insurance therefor.
2.  Same—Extended Insurance.—The words "dividend additions"
    as used in the New York statute refer to that part of the
    premiums charged which was "loaded" on to the premium
    in excess of its share of expenses and losses sustained. Such
    additions, and the earnings thereon, which constitute the
    "surplus," must be valued and applied in buying extended in-
    surance for lapsed policies in force three years or longer, in
    the same way that the "reserve" of the policy is required to
    be valued and applied in purchasing such extended insurance.
3.  Same—Valuing Surplus.—Insurance companies must keep ac-
    curate accounts with their policy holders as classes, failing
    which, no presumption will be indulged in the companies'
    favor when it comes to valuing and applying "surplus" or
    "dividend additions" to lapsing policies.
4.  Same—Dividends.—It is not optional with the directorate of

life insurance companies not purely stock companies, whether they will declare dividends, or to what extent, of the so-called surplus.

(Syllabus by the court.)

On rehearing June 26, 1907.

5. Insurance—Liability of Insurer—Life Insurance—Extended Insurance—Dividend Additions.—Laws of New York 1892, p. 1969, c. 690, Sec. 88, requiring the application of the reserve, on a polcy lapsed after being in force three full years, to the payment for extended insurance, and providing that "reserve" should include "dividend additions," meant that the surplus on a lapsed policy, as well as the reserve thereon, should be applied in purchasing extended insurance in case of lapse after a policy was in force three years, though the words "dividend additions" may have meant in a technical sense, in life insurance, additions on account of surplus to the face of a policy, payable at death while the insurance was in force.

A. E. WILLSON and W. H. MACKOY for appellant.

QUESTIONS DISCUSSED AND AUTHORITIES CITED.

1. That the contract evidenced by the policy of insurance was legal and one which the appellant was competent to enter into and had the authority to make: Charter of Appellant and Amendments thereto; Sec. 88 of c. 690 of New York Laws of 1892; N. Y. Life Ins. Co. v. Miller, 22 Ky. Law Rep., 230, 232.

2. The word "dividend," or "dividends," where it occurs in Sec. 88, Chap. 690, of the New York Laws of 1892, must be given the same construction as the word "dividend" in Condition VII. of the policy of insurance under consideration. The word "dividend" has a fixed and settled meaning: Thompson on Corp., vol. 2, sec. 2126; Greef v. Equitabe Life Ass. So., 160 N. Y., 19; Cook on Stock and Stockholders, sec. 542, Note 5, secs. 272, 545; Bouvier's Dict., vol. 1; Goodwin v. Hardy, 57 Me., 143, 145; Hyatt v. Allen, 56 N. Y., 553, 557; Brown v. Collins, Ky. Law Rep., 12 Eq. Cas., 594; Lowry v. Farmers L. & T. Co., 172 N. Y., 137, 144; Lockhart v. Van Alstyne, 31 Mich., 76; Williston v. Mich., etc., R. Co., 13 Allen (Mass.), 76.

3. The declaration of a dividend, in the absence of fraud or abuse of discretion, rests with the Board of Directors of a life insurance company as in the case of other corporations, and a policy holder in an insurance company is not entitled to a divi-

dend until one is declared: N. Y. Life Ins. Co. v. Miller, 22 Ky. Law Rep., 230, 232; Mut. Life. Ins. Co. of N. Y. v. Girard Life Ins., Ann. & Trust Co., Admr., 100 Pa. St., 172, 179, 180; Moss' Appeal, 83 Pa. St., 264, 269; Lowry v. Farmers' Loan & Trust Co., 172 N. Y., 137, 144; Joyce on Ins., vol. 2, sec. 1166; N. Y., L. & S. W. R. R. Co. v. Nickals, 119, U. S., 296; Beveridge v. N. Y., E. R. Co., 112 N. Y., 1.

4. There is no question in the case at bar of doubtful construction or repugnancy between Sec. 88 of the New York Law and Condition VII of the policy, and no room for the application of the rule that, in case of repugnancy, the construction must be favorable to the assured: Joyce on Ins., vol. 1, secs. 205, 212, 216, 21, 219, 222.

5. The relation between the appellant and the appellee and the insured is one of contract, and not of trustee and cestui que trust: Everson v. Eq. Life Ass. So., 68 Fed. Rep., 218; Uhlman v. N. Y. Life Ins. Co., 109 N. Y., 421; Bewley v. Eq. Life Ass. So., 61 How. Pr., 346.

(First)   The word "mutual" must be construed in connection with the entire charter of the appellant and the amendments thereto, and especially in connection with the amendment which was passed March 31, 1882.

(Second)  Sec. 88 of the New York Law is a part of the policy and must be construed in connection with Condition VII of the policy.

(Third)   The contract of insurance evidenced by the policy in question, did not require the appellant to keep a separate account of the receipts, disbursements or investments from policies of 'the Spinks class, or of any class. No such claim is asserted by appellee in his pleadings in this case: Bogardus v. N. Y. Life Ins. Co., 101 N. Y., 328, 335, 336, 337; Uhlman v. N. Y. Life Ins. Co., 109 N. Y., 421.

JOHN G. CARLISLE, C. E. PATTERSON, WM. A. ELLIOTT, W. H. MACKOY, AUGUSTUS E. WILLSON and MARSHALL BULLITT for appellant.

POINTS AND AUTHORITIES ON PETITION FOR REHEARING.

1. "Dividend additions' is a technical term, meaning the rate by a dividend previously declared out of surplus.

2. As the Spinks policy was a ten-year continuable term policy there could not under any circumstances be any "dividend additions thereto.

3. This court made both a mathematical and commercial error in assuming that because on those policies which were kept for ten years up until the end of the accumulation period the rate of dividend was 8 per cent. of the total premiums paid, it would follow that a similar rate of dividend was or could be earned on the total premiums paid for only three years.

4. Under Ky Stats., Sec. 656, as construed by this court in many cases, no alleged provision of a contract of insurance can be enforced unless contained in or attached to the policies sued on. In the case at bar the provision as to "dividend additions" is not contained in or attached to the policy and therefore cannot be considered for any purpose whatever.

(First) The New York statute only applies to business done in New York, and does not have any extra-territorial effect and cannot affect a contract made in Kentucky: Washington Life Ins. Co. v. Glover, 25 Ky. Law Rep., 1327.

(Second) The New York statute was not printed on the Spinks policy, and therefore cannot be relied on as a part thereof: In Provident Savings v. Puryear, 109 Ky., 381; Provident Savings v. Beyer, 23 Ky. Law Rep., 2460; Supreme Commandery v. Hughes, 114 Ky., 175; Mooney v. Ancient Order of United Workmen, 114 Ky., 950, 959 (1903); Hunziker v. Knights of Pythias, 117 Ky., 418; Letzler v. Pacific Mutual, 25 Ky. Law Rep., 372 (1905); Rice v. Rice, 23 Ky. Law Rep., 635 (1901).

L. J. CRAWFORD for appellee.

PROPOSITIONS ADVANCED AND AUTHORITIES CITED.

1. Appellant is a mutual company and cannot deny dividends to its policy-holders.

2. Sec. 7 applies only in event insured lives to end of term.

3. The New York law applies in case of death before end of term.

4. New York law is a check upon domestic companies, and means more than that the company shall include in reserve only such dividends as have been already credited to the policy. Otherwise it would have no effect.

5. The dividends were sufficient, treating policy as participating policy.

6. Keeping no account with any class entitles appellee to general yearly dividends.

7. The general dividends are sufficient.

United States Life Ins. Co. v. Spinks.

. 8. Even if contract is equivocal, all doubts will be resolved in favor of the insured.

9. Legislative checks upon tontine insurance: Vol. 26, 1st Ed., American and English Encyclopedia of Law, pp. 52, 53, 54; 61, 62.

Note—The New York Law, Charter and all material amendments are in the amended petition.

J. H. HAZELRIGG and L. J. CRAWFORD for appellee.

PROPOSITIONS ADVANCED AND AUTHORITIES ON PETITION FOR REHEARING.

1. The term "dividend additions" is a general term and means additions made to anything for or by reason of dividends.

2. New York law applies to "any policy" in providing for "dividend additions," and if these words mean only "paid-up additions" to the amount of insurance named in the policy, then policyholders who are not entitled to "paid-up additions" would be deprived of "dividend additions."

. 3. Dawson in his "Elements of Life Insurance" uses the term "dividend additions" several times in a special sense, descriptive of "paid-up additions," but uses many other expressions as descriptive of "paid-up additions." See pp. 98, 99, 105, 109, 116 and 144.

4. In 1875 the technical term for "paid-up additions" was the "reversionary value of the surplus." See Notes on Life Insurance, by Gustavus W. Smith, pp. 112, 113 (1875 ed).

5. The recent literature relied on in petition for rehearing is reviewed and the general and special uses of the term "dividend additions" and the various other expressions used in lieu of "paid-up additions" are pointed out.

6. The "Recommendations for Uniform Legislation," etc., and the New York Statute of 1906, by excepting term policies from the benefit of the New York statute of 1892, merely emphasize the fact that such benefits extended to term policis.

7. The loading of premium for dividend purposes exceeded 6 per cent of each premium.

8. The New York law is part of the contract and nothing in cases cited by appellant will preclude the court from so considering it. Such cases refer merely to applications, by-laws, etc., which companies attempted to rely upon, contrary to Sec. 679, Ky. Stats., or are not applicable for other reasons pointed out.

9. Sec. 679, Ky. Stats., was passed for the protection of policy-

holders, and a company can' not, by relying on it, take advantage of its own wrong.

10. Same as to Sec. 656, Ky. Stats., which makes it a criminal offense for a company not to plainly express the contract in the policy.

11. Appellant is a. mutual company and appellee's policy is a participating policy.

   (a)   See Art. 3 original charter of appellant.

   (b)   See waiver of mutual feature.

   (c)   No repeal of mutual principle.

12. References to "Dawson's Business of Life Insurance," ed. of 1906, pp. 3, 46, 51, 109, 110, 120, 164, 240.

13. References to proposed laws in the "Recommendation." See pp. 63, 66,, 82.

14. If contract doubtful, court will resolve doubt in favor of insured.

15. The company's charter directs a distribution of net profits. See subsec. 5 art. 6 (p. 22 printed record), and subsequent clauses of this article.

16. The reserve properly calculated runs from February 21, 1898, and without regard to "dividend additions," insured Spinks to a time thirty-eight days beyond his death.

OPINION OF THE COURT BY CHIEF JUSTICE O'REAR.—Affirming.

February 21, 1894, appellant issued to Charles Spinks a policy of insurance upon his life, payable to his son, Harry Spinks, appellee. The policy was an agreement to pay the beneficiary the sum of $25,-000 if the assured died within 10 years from December 12, 1893. The consideration was the payment of $1,128.25 annually by the assured on or before December 15th of each year, as premium, the first payment having been contemporaneous with the issue of the policy. Among the conditions contained in the policy was this clause: "(2) After being in force three full years, an extended insurance shall be allowed, in accordance with the requirements of chapter 690, p. 1930, of the Laws of 1892, of New York." The insured

paid appellant four annual premiums of $1,128.25 each, aggregating $4,513, which continued the policy in force regardless of chapter 690, p. 1969, section 88, Laws of New York, up until December 12, 1897. The insured did not pay the premium due on December 12, 1897.

Section 88, c. 690, p. 1969, Laws of New York 1892, is as follows: "Whenever any policy of life insurance issued after January 1st, 1880, by any domestic life insurance corporation, after being in force three full years, shall by its terms lapse or become forfeited for the non-payment of any premium or any note given for a premium or loan made in cash on such policy or security, or of any interest on such note or loan, the reserve on such policy computed according to the American Experience Table of Mortality at the rate of four and one-half per cent. per annum shall, on demand made, with surrender of the policy within six months after such lapse or forfeiture, be taken as a single premium of life insurance at the published rates of the corporation at the time the policy was issued, and shall be applied, as shall have been agreed in the application or policy, either to continue the insurance of the policy in force at its full amount, so long as such single premium will purchase temporary insurance for that amount, at the age of the insured at the time of lapse or forfeiture, or to purchase upon the same life at the same age paid-up insurance, payable at the same time and under the same conditions, except as to payment of premiums as the original policy. If no such agreement be expressed in the application or policy, such single premium may be applied in either of the modes above specified at the option of the owner of the policy, notice of such option to be contained in the demand hereinbefore required

to be made to prevent the forfeiture of the policy. The reserve hereinbefore specified shall include dividend additions calculated at the date of the failure to make any of the payments above described according to the American Experience Table of Mortality with interest at the rate of four and one-half per cent. per annum, after deducting any indebtedness of the insured, on account of any annual or semi-annual or quarterly premium then due, and any loan made in cash on such policy, evidence of which is acknowledged by the insured in writing. The net value of the insurance given for such single premium under this section, computed by the standard of this State, shall in no case be less than two-thirds of the entire reserve, computed according to the rule prescribed in this section after deducting the indebtedness as specified, but such insurance shall not participate in the profits of the corporation. If the reserve upon any endowment policy, applied according to the provisions of this section as a single premium of temporary insurance be more than sufficient to continue the insurance to the end of the endowment term named in the policy, and if the insured survive that term, the excess shall be paid in cash at the end of such term, on the conditions on which the original policy was issued. This section will not apply in any case where the provisions of the section are specifically waived in the application, and notice of such waiver is written or printed in red ink on the margin of the face of the policy when issued." As the provisions of this act were not specifically waived in the application or otherwise, or notice of such waiver indorsed in red ink on the policy, the last section of the act above quoted is not applied, and the act is to be treated as if that section had been omitted.

On January 27, 1898, the assured, Charles Spinks,

and the beneficiary, Harry Spinks, appellee herein, requested the appellant in writing to apply the entire reserve on the policy, including dividend additions, if any, therein calculated as provided in the policy, to be taken as a single premium to continue the insurance of $25,000 named in the policy in force at its full amount for such time as said single premium would purchase that amount as non-participating insurance at the company's rates therefor at the date of the policy, taken at the age of the assured at date of default, subject to the conditions and agreements of the contract contained and referred to in the policy. The written application was transmitted with the policy to appellant, who on February 14, 1898, issued and delivered to Charles Spinks its certificate of extended insurance which was in these words: "The United States Life Insurance Company in the City of New York, doth hereby certify, that in pursuance of the application therefor, of which the above is a copy, the principal sum of insurance mentioned in the hereto annexed policy No. 79,714, on the life of Charles Spinks, and (if all the terms and conditions of said policy, in it contained and referred to, have been and shall be fully kept, and not violated), payable in the manner therein mentioned to the persons therein described as the payee thereof, viz., $25,000.00, will be so payable as continued insurance, in the event of the death of the insured life on or before the 10th day of August, in the year eighteen hundred and ninety-eight; but after said date said policy, and the continued insurance thereunder, will in all respects be and become determined and null, void, and of no effect. The continuation of the insurance as aforesaid being in accordance with the conditions and agreements in said policy mentioned, and the application for said

continued insurance, of which the above is a copy, as aforesaid, and which application is hereby made a part hereof. Dated, New York City, February 14th, 1898." The assured, Charles Spinks, died September 13, 1908. No other action was taken before his death either by him or the insurer relative to any other extension of the policy.

Thereafter this suit was brought by appellee as the named beneficiary to recover from appellant the full amount of the insurance. In addition to the foregoing facts, it was alleged in the petition that there was a considerable sum in the hands of appellant (hereinafter sometimes referred to as the "Company") known as surplus, belonging to, and contributed by, the policy holders, of whom Charles Spinks was one of a class, and which was subject to dividends on behalf of such policy holders; that of such surplus there was enough due to be applied to the policy in suit on February 14, 1898, and, on the date of the default in the payment of premium by the assured, which, if applied as a single premium at the company's published rates at the date of the policy, would have purchased for the assured extended insurance for the full amount of the policy for a period beyond September 13, 1898; that the company fraudulently, or by mistake, failed to include such dividend in the reserve of the policy when it extended the insurance, although assured had applied for it to do so, and never knew but what it had done so. It was also charged that appellant was wholly a mutual company. The company denied that there was any dividend addition which could have been applied to the extension of the policy; denied that it had ever declared any dividend to this policy; and denied that there was any fund out of which it could have legally declared such dividend. It

also pleaded that the policy was a deferred dividend term policy of life insurance, containing among other things these express conditions: "(1) All premiums are payable in New York City at the company's office. * * * Failure to make payment of any subsequent premium either to the company or to a duly authorized agent, in exchange for receipt signed as above * * * will render this contract null and void. Whenever this policy shall become null and void for any cause, all payments made hereunder shall become forfeited to the company, except that: (2) After being in force three full years, an extended insurance shall be allowed, in accordance with the requirements of chapter 690, of the Laws of 1892, New York. * * * (7) The said company agrees, in case the life insured survive to the end of the specified period, if this policy be then in full force, to pay to the legal holder or holder of this policy the dividend apportioned to this policy from its profits by said company." Appellant pleaded that clause 7, just quoted, excluded the Spinks policy from participation in any division of profits or surplus, unless the assured survived the period for which he was insured, and unless the policy was then in full force; that, as he died, and was also in default of premiums, within the 10 years, the policy was not in full force at the expiration of the term, and was not therefore entitled to participate in any distribution of the surplus or profits among appellant's policy holders. It denied that it was a mutual company, and denied that it had, through fraud or mistake, failed to credit to, or include in, the reserve of said policy any dividends from the surplus and profits, though it admitted that it had not done so, but claimed that it so failed because the policy was not then, and never was, entitled to share in such profits or surplus or any

dividend thereof declared. On motion of appellant this action was transferred to equity, and was tried on its merits by the chancellor, who found that the policy sued on was entitled to share in the surplus, and that its share, computed according to the provisions of the policy and the laws of New York, was sufficient to have extended it beyond the date of the death of the assured. It was consequently decreed that the beneficiary recover the full sum insured from the company with interest from the filing of the suit. The company has appealed.

The questions for decision are two: First, What is the meaning of the term "dividend additions," as used in the New York statute which is quoted ante? Second, Was there due to be applied to this policy at the date of the default in premiums, a sum sufficient of such dividend additions, when added to the value of its reserve, to have paid for an extension of the insurance to and including September 13, 1898?

Appellant contends that the word "dividend" has a well-defined legal meaning, which is in accord with its popular use; that it signifies such portion of accumulated net earnings, or surplus, as the directorate of a corporation may deem expedient to be distributed, and in appropriate proceedings is by them ordered to be distributed among those entitled by law to receive it; that a dividend is ex vi termini the part of a thing which has been set apart for distribution. Counsel for appellant therefore argue that as there was not official action in declaring or setting apart a dividend, none could be added to the reserve of the policy; that the matter of declaring dividends from the company's surplus, or net profits, was one committed properly and necessarily to the sound business sense and discretion of the directors, to be exercised by them in

behalf of the company and its patrons as their best interests appeared to the directors to justify. That this is the rule commonly applied to corporate dividends cannot be denied. And if the word dividend is used in the New York statute in the sense and to express the same idea as when used ordinarily regarding the distribution of the surplus earnings of other corporations, it seems to us that appellant's attitude is unassailable. Whether the word is so used involves a careful study and an understanding of certain terms commonly employed in the business of insurance, and which are found in the statute and policy before us, to the end that we may see whether, in expressing the mind of the legislator or contractor, the language employed has a peculiar, or only the common, significance, for it is well known that words of common use, and having a generally accepted single meaning, when so used, may have an entirely different meaning by the usage of a particular trade, cult, or business. And, as the use of all words is to express the idea intended to be understood, the meaning which the user of the words had in mind is the one to be applied in interpreting his written or spoken language. To understand him, we will have to put ourselves in his place, to view the subject from his point of view, and to give to his words the same meaning which he understood and intended them to have. If, therefore, the words to be interpreted had a peculiar meaning when used in reference to life insurance, the legislature and the contracting parties in this business evidently employed them in that sense. We must see whether they had such meaning.

Life insurance is not a modern business invention, although modernly many new features have been added to it, which may seem to be foreign to its origi-

nal conception. But the main principle upon which it rests has not been changed. The plan is to collect from a class of selected persons, chosen with reference to their ages, health, occupations, and so forth, such a fixed sum as will, when kept safely invested at interest, pay to the estate of each of them when he dies, a certain sum of money, which was originally taken as the basis of the collections. It has been found, and it is a fact, that this can be done. The percentage of mortality of such persons is ascertainable in advance. From a long series of observations it is known to a reasonable certainty how many of the number will die within a given time. Thus the life tables, or tables of mortality, have been made up. The one in most common, if not universal, use in this country, is the American Experience. From these it is shown that of a given number of such persons of the same age and condition, each contributes a certain sum, either in one lump sum in advance, or in annual installments, that such contribution when loaned or invested at current interest compounded will so increase that as each one of the contributing class dies there will be enough in the common fund to pay to his estate a principal sum previously taken as the basis of the charges which he has contributed. The sum which he is required to pay is called the premium. If 1,000 men, aged 20, enter into an agreement to pay each one as he dies $1, and to provide in advance a fund therefor, which will be sufficient, and no more than sufficient, to meet the undertaking, they find that from the tables of mortality so many will die the first year, so many the second year, and so on, so that enough will have to be paid in advance that out of it there can be paid the death claims of the per cent. who will die each year, and leave enough which, placed at

compound interest, will accumulate a fund sufficient to pay all the others as they die the agreed sum of $1. Obviously, the first important step in formulating the scheme is to determine that amount of money which will, when increased by interest at a given rate per annum, compounded annually, become $1 in a given number of years—the expectancy of the duration of life of the whole class. This amount will constitute the premium. The rate of interest must of course be not greater than current rates, and should be slightly less. Insurance companies generally adopt 4 per cent. or 4½ per cent. as the basis of such calculations. It will of course require more money at 4 per cent. interest to produce $1 at a given future date than at 4½ per cent. interest. Therefore the greater the interest rate adopted the smaller the premium charged. Thus we find that $0.95693-|- will at 4½ per cent interest become $1 in one year. For two years there would have to be such sum as would being put at interest at 4½ per cent. for two years produce $1, which would be a less sum than required to produce $1 in one year, and for three years a still less sum, viz., $0.87629-|-. The longer the principal sum could be at interest the less it would have to be to start with to produce $1. So when we have the table of mortality showing the average life or expectancy of the class to be insured, it can be worked out to a mathematical certainty just what sum is required to be paid by each to be loaned at 4½ per cent. interest compounded annually in order to pay them all $1 each as they died. Only a certain per cent. of 1,000 insured will die the first year, hence the whole sum that would be required to be put at interest to pay them all the full amount will not be called for. The life tables will show how many will probably die. The fraction produced by the mortality

number divided by the number of insured, when multiplied by the sum to be put at interest at 4½ per cent. for one year to produce $1, will then represent what each will have to pay in advance in order to have in the common fund enough to pay the death claims maturing that year. This effects the insurance for one year only. Only those dying get anything. The survivors get nothing. They have been insured—have been protected against the chance of being included in the number who died. This would be called the net cost of insuring $1 for one year. The cost of insuring $1 for a whole life is made up by adding together the net cost of each year beginning with the age of the insured when the insurance is effected, and continuing to the end of his expectancy, which would be the net single premium for whole life. But, as life insurance premiums are generally paid annually, or annually for a limited number of years, instead of one premium for the whole life, the sum to be paid each year as an annual premium is arrived at by a mathematical process not necessary to set forth here, but which is, nevertheless, certain, and the one adopted by all life companies. This annual net premium is divided into two parts: One, to help pay death claims occurring that year, being the proportion that policy is required to contribute to pay death claims arising that year in its class, and the other is placed by the insurer at interest to the credit of a fund which shall at all times be kept equal to the net single premium that will at the age the policy holder has attained be sufficient to then effect his insurance. The fund is sometimes called by one name or another, but is now commonly known as the "reserve," and is regarded by every well-informed authority "the great sheet anchor of life insurance." It will thus be seen

that the policy holders effect and pay their own insurance. They insure themselves and each other. It is essentially mutual. No company ever has to any great extent, and in the nature of the business cannot, do a life insurance business on any other basis than that of making the insured lives carry their own insurance. No stock company is rich enough to carry upon its capital alone the weight of liability represented by the policy liabilities of any of the great modern life insurance companies.

But we have traced the business only so far as to show the net cost of insurance, and how it is provided. There are of course expenses to be met in the conduct of the business. Managerial, rents, taxes, advertising, and agencies. These, too, must be borne by the benefited class, the policy holders. So enough must be added to the net premium charged to cover these expenses. There is also added something to cover such contingencies as that the death rate in any year from some abnormal cause, such as a great epidemic, shall increase beyond the average expectancy, and for the loss in value of investments caused by financial panics, or by dishonesty of officials. The sum added to the net premium to meet these expenses and contingencies is called "loading" the premium. As such expenses and losses cannot certainly be known in advance, an approximation is made, and the total sum collected is called the gross premium. That is the premium actually charged and collected from the insured. It is applied, or ought to be, first, to pay that policy's proportion of that year's death claims; then to make good its own reserve; then to pay the expenses, including all official salaries; then to pay losses, if any. If there should be a balance after paying those items, it is called a "surplus," which is a

pretty good name for it.  The aggregate of all the
excessive collections of premiums in that year consti-
tute that year's accumulation of "surplus."  This
fund is sometimes called, or miscalled, "undivided
profits," or "surplus earnings," or the like.  But it
represents only the aggregate of overcharges of prem-
iums assessed against the policy holders.  The greater
it is, the greater the unnecessary exaction that has
been made by the insurance company from its policy
holders in carrying on the business of collecting from
them a sufficient sum to pay all of them the sums
agreed at their deaths, and in the meantime to pay
all the legitimate and necessary expenses of mainte-
nance.  If the insurance company doing the business
were only a stock company, in the absence of statutory
regulation, all "surplus" or "profits" would belong
to the stockholders.  It would represent that much
more charged for doing the business than it cost, and
would be properly profit.  But where the company is
a mutual, being conducted on the plan of giving the
cheapest safe insurance to its members, all surplus
ought to belong to the members, the policy holders.
For in a purely mutual company there are no stock-
holders, and no one else therefore to whom the surplus
could go than its policy holders.  And, it should in
equity go to those who had contributed it.  The
officers of such a corporation being paid salaries for
their services have no interest as such in the surplus.
In mixed companies—that is, partly stock and partly
mutual—the act creating them usually designates the
maximum per cent. that shall be paid in dividends to
the stock, the residue of "surplus" or "net earnings"
going to the contributing policy holders.

We find from this record that appellant belongs to
the latter class.  The maximum dividends to its stock-

holders were all paid, and were deducted from the gross earnings. The "surplus" was what was left after paying the dividends to stockholders, all expenses and all losses, and after providing for all death claims and for maintaining the reserves. Hence this "surplus" should be treated as if the company were purely a mutual company. Not only ought the surplus to be divided among the policy holders contributing it, as a matter of equity, but an amendment to appellant's charter provides for limiting the amount of capital stock, and the rate of "interest" it shall receive, and excludes the capital from receiving any other rate of interest or any share in the "net profits, surplus or dividends of the company." The act continues: "But thereafter the entire net profits and divisible surplus shall be ascertained by the board of directors in accordance with the contracts between the said company and its policy holders respectively; and annually, or once in two or more years thereafter, the sums which may be set apart by the said board from such net profits or divisible surplus for such purposes shall, in the manner provided in said charter, as hereby amended, be apportioned among the policy holders entitled to participate therein according to their respective classes and the terms of their respective contracts." Act March 31, 1882, Laws New York, 1882, p. 36, c. 44. It is upon this amendment that the company rests its contention that, under clause 7 of the policy, ante, it and Charles Spinks agreed that this policy was not to share in any distribution of profits until and unless he survived the term of 10 years; and that all the surplus of that class should be distributed to those of the class who did survive and persist in their membership. Appellant claims that this constituted the policy a tontine. The

original tontine contemplated that the total fund should go to the survivors of a class, regardless of the cause of their dropping out. When applied to insurance it seems to have an opposite effect from the real matter of insurance, the latter being to pay you if you die, the former to pay you if you do not. Tontine insurance, therefore, was an agreement to divide the "surplus" which all of that class had contributed, among those who outlived the term agreed upon, and who persisted as paying members. It is a species of hazard, in which the strong and the rich have the greater chance of winning, although they pay no more for it. The poor, the weak, and the unfortunate are almost sure to lose. The system gathers together enormous sums, not always properly handled or invested, which are placed for a long term in the sole custody of agents for investment and speculation, and whatever remains after the term has expired goes to those in the main whom the circumstances have proven needed it the least. The plan has met with much criticism, and it is forbidden altogether by the laws of some states. This suggests one, and brings us to consider the other, abuses that led to the enactment of section 88 of chapter 690, page 869 of the Laws of 1892 of New York.

From what has been said, it will be noted that each policy holder of life insurance contributes his own policy reserve. When, for any reason, he dropped his insurance, or failed to pay an annual or other installment when due, formerly the company forfeited his contract, and appropriated all he had paid. This was tolerated a long time upon the popular supposition that each year's premium paid for that year's insurance only. It was not generally known that a large part of it went to the creation of a reserve fund

to carry that identical insurance to maturity. In this way enormous sums were confiscated by insurance companies, to which they had no equitable right, and in mutual companies to which they had no right at all. This led to widespread and wholesale corruption in the management of insurance companies. Exposure of the methods occurred first about 1860. Not a great while afterward, and as the direct result of the exposures, Massachusetts adopted the now famous non-forfeiture law, which was aimed to prevent the forfeiture of a life policy after it had accumulated a reserve, but required the application of the reserve to the purchase of extended or paid-up insurance for the assured to the extent that the value of the reserve would buy such insurance at the single rate, that is, one-payment rate of the insuring company. This statute, so eminently just and wise, is now very generally adopted in the United States, and the same idea has been adopted by nearly all, if not all, insurance companies now by reason of the competition they would be otherwise unable to meet from companies where the statute is in force. Massachusetts, and perhaps other states, have adopted also an "annual dividend" statute, requiring the yearly distribution of the "surplus" among policy holders contributing it. This legislation is of a kind with the other. But it goes further. It prevents a species of extortion upon the policy holders becoming effective for great evil. Undoubtedly, the accumulation of vast sums of money in one center, improperly gotten together and unfairly held, is a sore temptation to men, if unscrupulous and adventurous, to embark it in purely speculative ventures, in which they would directly or indirectly derive great profit to the detriment of the owners of the fund. Its tendency would be to encourage dis-

honesty, and the unnatural disturbance of business and of market fluctuations thus illegitimately brought about. So it is a wise exercise of the police power of government that tends to prevent such abuses.

It is too well settled now to need citation of authority that life insurance is a business that the State may, regulate under its police power, exercised for the public good. The statute being considered is of that species. Its first aim was to prevent a confiscation of the policy holder's property to the benefit of another. It was recognized that unforeseen casualty, unexpected and sudden poverty, sickness, sudden mental derangement, unavoidable absence, forgetfulness, or other cause, might intervene to cause a policy holder to fail to pay his premium the day it was due. Forfeitures are abhorrent to the law. The State intended by this statute to prevent just such forfeitures. It forbids them. But, as the insured had paid in his money for insurance, it was recognized that it would be unjust to make the company give him anything for his money but insurance. So the plan was evolved to convert his funds in the hands of the company into money, and then apply that money to buy extended or paid-up insurance of the kind shown in the original contract. The company is no more entitled to confiscate or forfeit the policy holder's "surplus" than his "reserve." Such forfeitures would have benefited the same persons precisely, and have injured the owner in the same way and from the same cause. Having determined to prevent forfeitures, the next step for the legislature was to provide a plan by which the value of the defaulted policy might be justly and correctly ascertained. Obviously, the surest way was to follow the same line as the company had in calculating the premiums, which was, as

the legislature doubtless determined, on the 4½ per cent. interest basis, and the American Experience Table of Mortality. In that way, any actuary could easily compute the minimum value of the reserve with certainty. This value of the reserve was then, by the statute, required to be applied in the purchase for that policy of an extended insurance, unless the policy holder elected to take paid-up insurance. But the legislature saw that it was saving to the policy holder only a part of his money, in so converting and saving his "reserve;" that he would for the same unfortunate cause which had been deemed by the legislature sufficient to enlist its exercise of the State's police power on his behalf, with respect to his reserve, lose still another part of his money, which was collected from him precisely as the reserve was, viz., his contributions to "surplus." To complete the equitable purpose the legislature then declared "the reserve fund hereinbefore specified shall include dividend additions." If the section had ended there what was meant by the phrase "dividend additions" might have been more obscure than it now is. It is difficult to apply the word "additions" to a dividend which had been declared in the usual course of a corporation out of its net earnings or surplus. The word "additions" has a particular meaning as used. We have seen that there are additions to the net premium in life insurance for various purposes, the surplus of which is to be paid back to the contributors by the way of dividends. So "dividend additions" means the additions which the company made to the net premium in "loading" it, out of which dividends were to be distributed to the policy holders. The section does not end with the expression just quoted. It continues by directing how such "dividend additions" are to be

valued, which is seen to be in the same way that the reserve is. This is certainly right and understandable. The sum of the "dividend additions," or distributable surplus, has been contributed by all the policy holders in the same proportion that they paid their premiums. For example, a man aged 40 pays a higher rate of premium than a man aged 20, both having the same kind of policies. It is also true that a man aged 40 pays a different rate of premium on an insurance for life than a man the same age would pay on a 10-year payment plan. Recognizing that the surplus belongs to those who contributed it, and in the same proportion that they contributed it, the statute points out that the value of each man's equitable share of it must be ascertained by reference to the plan upon which his whole premium was based. For it was known that after the net premium was ascertained, based on the American Experience Table of Mortality, and interest at $4\frac{1}{2}$ per cent., it was loaded in the same proportion; that is, 33 1-3 per cent, or 30 per cent, or whatever may have been added, was added calculated upon the level of the net premium. So, if the loading was 33 1-3 per cent, a man aged 20, whose net premium was $24 for $1,000 of insurance, would be charged as premium $32, while a man aged 40, whose net premium was. $30 on $1,000 of insurance, would pay $40 as premium. One would have contributed $8, while the other contributed $10, toward expenses, etc., on policies for the same amount and class. Yet each contributed on the same basis, the same general plan of calculation. So that whatever was left as surplus would have to be redistributed upon the same plan that it was originally collected to get at the equitable sum due to each. This construction satisfies and employs every word

of the statute, and gives a meaning to each sentence and phrase.

As opposed to this construction, we quote appellant's contention: "What section 88 means is that, where a life insurance company has declared dividends prior to the lapsing of a policy, which dividends had been credited to the holder of the policy at the time of the lapsing of the policy but were not payable, the value of such dividends should be ascertained as provided in section 88, and then should be added to the reserve in determining the amount of the single premium to be applied to the purchase of extended insurance." This contention is unsound. It would allow the company to defeat all dividends by never declaring them, and particularly by not declaring any during the term of the policy. Thus would the construction defeat the statute. It does not attempt to account for the use of the phrase "calculated at the date of the failure to make any of the payments above described according to the American Experience Table of Mortality, with interest at the rate of 4½ per cent per annum," etc. It eliminates that phrase by leaving it meaningless. If the dividend had already been declared, its value was then already ascertained and was worth just as many dollars as its face. It would be unnecessary then to calculate the value of dividends already declared in money as earned and actually apportioned. Nor do we see how such a calculation of value could be based upon an experience table of mortality and interest at 4½ per cent. Nor could the sentence quoted above from the statute have referred to the manner of applying the value of the dividend additions, for the manner of application is elsewhere specifically directed, viz., at the company's published single premium rate in exist-

ence when the policy was issued. Furthermore, the following clause in the statute shows that the surplus was intended to be disposed of by that proceeding without a dividend thereon having been declared by the directors. It provides that the insurance so purchased (by applying the value of the "reserves" and "dividend additions" belonging to the policy) "shall not participate in the profits of the corporation." Manifestly, if appellant's contention were the correct one, if the "reserve" of the Spinks policy had been enough to carry it to the end of the 10-year period, and he had then survived, he would have been entitled to such share in the "profits" he had contributed to, because his share had not otherwise in that event been appropriated by him nor forfeited.

We construe the term "dividend additions," as contained in this statute, to mean that portion of the surplus in the hands of the company, accumulated from the premiums and profits paid upon and made upon the class to which the policy in question belonged; that a defaulting policy holder's share of "dividend additions" was to be ascertained as of the date of the failure to make any payment of premiums on the basis of the American Experience Table of Mortality with interest at 4½ per cent. per annum. In other words, on the same plan that his policy had contributed to the creation of said surplus. We have been left without precedent to guide us in this construction—for the statute does not seem to have been construed by the court of appeals, or even by the supreme court of New York. Nor are we cited to any construction of this or any similar statute by the court of any State. We have had recourse only to the history of life insurance, its nature, its abuses and the legislation aimed at its abuses, shown by the con-

temporaneous history and legislation of the country. Greeff v. Equitable Life Assurance Society, 160 N. Y. 19, 54 N. E. 712, 46 L. R. A. 288, 73 Am. St. Rep. 659, is cited and relied on by appellant. That opinion holds merely that an action at law will not lie to recover a persisting member's share of alleged profits without showing that such profits existed, and that the board of directors had declared a dividend to the class to which the complainant belonged. It was intimated in the opinion that, if there had been a charge of fraud against the action of the directors in failing to make a declaration of dividends, equity would have afforded ample relief to the complainant. Uhlman v. N. Y. Life Insurance Company, 109 N. Y. 421, 17 N. E. 363, 4 Am. St. Rep. 482, is to the same effect. These cases would have been in point if Spinks had survived the insured term and then had sued to recover dividends. Clause 7 of his policy provided for a distribution in case he survived, or in case he forfeited his right to share in the profits. The Legislature of New York, by section 88, supra, has provided against a forfeiture of his share of this surplus because of his mere failure to pay a premium, but applies his share of the profits then to buy additional insurance—a phase not contemplated by clause 7 of the contract. But though it had been otherwise stated in the contract, we apprehend the statute would have overcome it, and been available to the insured, anything in the contract to the contrary notwithstanding. The proof shows that there was a very considerable surplus belonging to the class of which Spinks' policy was one. Its size in figures is not shown. But it appears that the company paid on an average a fraction over 8 per cent. of all premiums as dividends to the other members of that class who

persisted. It is not an unreasonable inference from the proven facts that the Spinks policy upon the same basis, or upon the basis fixed by the statute, was then entitled to at least as much as 8 per cent. of all premiums he had paid. In other words, all premiums of this class were loaded 8 per cent. or more above what was actually required to pay the interest to stockholders, and all expenses of maintenance, extension and losses.

Appellant complains of this method of ascertaining what the Spinks policy's share of the surplus was, as in the method actually employed by appellant in declaring the subsequent dividends all lapsed · policies, such as Spinks' was treated to be, were ignored, whereas, if they had been included, the result would have been different, and the dividends less, it would seem. The record discloses a novel procedure by appellant in the matter of distributions of surplus. No account was kept with any policy. Nor were they classified. All collections were treated alike in the bookkeeping. Periodically the board of directors, in looking over the company's affairs, would decide that so many thousands of dollars could be spared judiciously in dividends to policy holders. Then that sum was apportioned among all policies maturing in that year, or whatever period of time may have been selected for the purpose. This seems to be justified in the opinion of the company upon the supposition that it had the right to declare dividends or not, and as much or little as its directors chose. We are not called upon in this case to pass on any feature of this method of doing business other than that of keeping the accounts so that it may be ascertained by those in interest what they are entitled to receive. The company, as a mutual company, is

bound to treat the accounts of its policy holders as if they were cestuis que trustent. Every one who assumes for pay to handle the funds of another to a specific end ought to be supposed to keep accounts, and not to mingle them so as to balk every reasonable effort to get at just what is owing. The matter of keeping a fair, correct account in this matter does not appear so difficult as to be excused. If 1,000 persons were insured in 1884 for a term of 10 years, they naturally formed a class. An account of all premiums collected from that class is not difficult to be kept, nor is it unreasonable to require it. It should show the deaths in the class. The expenses and losses of the whole business could be apportioned among all the policies, the proportion of this class being charged to the class. In this way its share of ''surplus'' or overcharge of premiums would be easily ascertained in any year. A failure to keep the books so that the interested parties could, with reasonable facility and certainty, see what their interests in their property was, is itself a fraud upon their rights. Although it is true that, in the matter of contracting for insurance between the insurer, and insured, the result is to be regarded as a contract which is to be construed as such, and the liabilities of the parties enforced as such, still, their relations may be also more than that of simple contracting parties. We think it was incumbent on the insurer to keep intelligible and accurate accounts with its policy holders as classes, so that it could be seen from the books just what was due to be distributed to each, and, if it failed to do this, it will not be allowed to profit by the confusion occasioned by its failure.

But the failure to keep such books does not leave the policy holder without remedy, or the court without

power to judge the matter. If a party charged with the duty of keeping true accounts neglects to do so, the law indulges no presumption in his favor because of the absence of such evidence. And, if a party, having accounts in his possession which presumably show the amount of dividends to which a claimant was entitled, shows that it has paid uniformly 8 per cent. to other claimants and denied the suing claimant any, because it was deemed he has forfeited his right to it, it will be presumed against such party from his failure to keep and produce accurate accounts of the transaction, and from his failure to produce the evidence in his control showing the true, or the approximate, state of the accounts, that such as he did keep and produce were no less favorable to him as applied to the case on trial than the facts warranted. We find evidence in this record that, if 8 per cent. of all his premiums paid had been ascertained as Charles Spinks' share of the undivided surplus as of the date of his default, it would have extended his policy much beyond the period of his death. Indeed, a much less rate would have done so. Equity regards that as done which should have been done. Appellant was applied to to extend the policy by applying, not only the reserve, but dividend additions to purchasing such insurance. The law required appellant to issue a certificate of insurance therefor. In the certificate which it issued appellant stated that the time extended was all that the convertible value would buy. We find this was not true; the value of Spinks' "dividend additions" was not applied by the company in extension of the policy. The effect of the application and the statute is that the policy was extended beyond the date of Charles Spinks' death, by applying the ascertainable value of

the dividend additions of that policy to the purchase of such extension. This result coincides with the conclusion reached by the circuit court.

Wherefore the judgment is affirmed.


RESPONSE TO THE PETITION BY APPELLANT FOR REHEARING JUNE 26, 1907, BY CHIEF JUSTICE O'REAR.


This case was orally argued before this court on May 2, 1907, on appellant's petition for rehearing. The original opinion was delivered October 19, 1906. Since the opinion appellant has made a complete change of its position in this case, utterly and expressly abandoning its former contention, and now urging that "dividend additions" is a technical term employed in life insurance which is old and well known, and means altogether a different thing from what the court has found, as well as from what appellant originally argued.

Appellant's change of base should detract nothing from the correctness of its present attitude. if it is correct; but it·may furnish a very tangible illustration of the error of its present contention on its merits, for it may illustrate that the use of the term is not so well known, even in insurance circles, and therefore not presumably used entirely with reference to its technical sense. The question is: How did the New York Legislature employ the term "dividend additions?" The question is one of more than incidental importance. We have the same expression in the nonforfeiture insurance statute of this State. The construction given the one would doubtless be held to apply also to the other. We are referred by

counsel for appellant to certain histories of life
insurance in which it appears that "dividend addi-
tions" was a term sometimes employed in life in-
surance to represent additional insurance set apart
by the insurer to a policy whose dividends had accum-
ulated to a period of distribution, and which had not
been otherwise applied.   For example, it is said:
"The method of dealing with the surplus on policies
entitled to participate therein, which was intended
by the founders of the Equitable of London, was, as
we have seen, to divide the same to the insured at
frequent intervals in cash.   The method actually
adopted by the Equitable of London, as we have
also seen, was to grant reversionary bonuses, payable
at the death of the insured, and to make apportion-
ments every seven years.   The application of surplus
earnings to purchase reversionary bonuses, known in
this country, as 'paid-up additions,' 'reversionary
additions,' or merely 'dividend additions,' was also
employed in this country at an early date."   Daw-
son's Elements of Life Insurance, p. 105.   It is quite
likely that some companies did, and may yet, issue
policies which permitted that privilege; but we are
unacquainted with any statute which required it, or
with any general practice of the insurance companies
which permitted it.   There is nothing in this case to
show that appellant does now, or ever did, indulge
the practice.   Still that might shed but little light on
the true construction of the statute under considera-
tion.   Appellant's contention now is that this
expression "dividend additions" is a term of art,
and has now, and always had, but the one meaning,
which is those additions to the principal sum insured
which the divisible surplus would buy as paid-up
insurance for the insured, payable at his death, as

the principal insurance was. That form of insurance is believed to have been rare, as compared with the bulk of all insurance. That it is indulged by some companies, and possibly would be written by all, need not be doubted. But the fact remains, as is most evident by a cursory glance at the statements of any of the old line insurance companies, that the "surplus" was not generally so employed. If it had been, the ernormous surpluses, advertised as evidence of good management, and really evidences of oppressive management, could not have existed.

But we are entitled to look beyond the technical meaning of terms used in a statute to ascertain the intent of the Legislature, if the meaning of the language of the act be obscure. One of the first, and one of the surest, sources of information, is to look to the evil that was intended to be remedied. In this instance what was the evil? It assuredly was not that insurance companies were unjustly forfeiting that part of the insurance which had been paid up in full. That is precisely what a "dividend addition" is, as described by Dawson, and now contended for by appellant. Those companies that applied the "surplus" to buying additional paid-up insurance for the beneficiary were those whose sense of equity, without coercion from the Legislatures, had led them to adopt the measure. They were not, and none others in considerable instances were, so far as we know, forfeiting such additions at all. Indeed, there was no ground whatever for doing so. As they, in any event, were fully paid up, nothing in the way of failure to pay premiums to keep up other insurance by the assured could possibly affect them. But there was in 1879 and 1880, and had been for a decade or more previous, a crying evil in life insurance, which had

aroused widespread bitter feeling, and had brought
the management of insurance companies under severe
criticism; and that was the unjust, unconscientious,
inequitable practice of forfeiting the reserve, as well
as accumulations of "tontines" in event of a failure
of the insured to pay each recurring premium. The
bubble that had grown to the most noticeable propor-
tions was that of the "tontine" feature, a pure hazard.
But many companies issued "semitontine," "free
tontine," and other policies partaking more or less of
the character of the pure tontine, which, as has
already been pointed out, was not insurance at all,
strictly speaking. Among those mentioned was
"deferred dividend" policies. They were, if you died
before the period arrived for declaring the "divi-
dend" out of the "surplus," you got no part of the
"surplus"—that went to those who survived the
"period of distribution" (which, by the way, is the
class to which the policy in the case at bar belongs).
If you did not die, but failed to pay a premium, you
forfeited your part of the "surplus" and everything
else under your contract. If you survived the period
of distribution, you would be entitled to have dis-
tributed to you by the company what it might then
be pleased to apportion to your policy. There was
not much chance for the company to lose anything by
following the plan. There was about as small a
chance for the policy holder to get anything out of it.
Millions of insurance of this character was being
written. The first "tontines" originated by the
Equitable of New York and adopted by the New
York Life and others, had begun to mature, and
were proving great disappointments. Although many
thousands had forfeited their whole investment by
nonpayment of premiums, still the survivors got back

much less than upon any right calculation they had reason to expect. It was this situation that was in a state of popular ferment that led up to the legislation in New York and other states about that time, shown in the statute now under examination. The statute aimed to protect the policy holders in their own, and no more; but equally certainly no less. It would be inexplicable that the Legislature could have intended to protect policy holders from the forfeiture of their reserves, and additions to their insurance bought by a part of the "surplus," and yet allow that their "surplus" which had not been so applied could be forfeited for the same cause which was deemed inequitable and unjustifiable, and which experience has demonstrated was in truth so.

Given that all premiums paid in had been apportioned to (1) paying their share of death claims, (2) their share of expenses, (3) to maintaining the "reserve" to finally redeem the policy, (4) to a surplus which belonged as truly in equity to the policy holders as did the reserve, which surplus may have been partly applied under a limited number of policies to buying additional paid-up insurance, and the remainder of it unapplied, while in the great bulk of insurance there was no provision or practice of issuing "dividend additions" insurance paid for out of the surplus. Now, why should the Legislature have provided against the forfeiture of all of these interests of the insured except the last? No reason is assigned in argument by appellant; and we feel safe in concluding, after a careful study of the question, that there is none. The history of insurance shows that terms which might be deemed technical were frequently changed. Sometimes one term was used to express the idea, and sometimes another.

They were purposely changed, we have no doubt, to mislead in some instances. Yet the matter of life insurance is of such a nature that its fundamental principles must necessarily remain the same, whatever name they may be called by. As attempted to be pointed out in the original opinion, the insured in reality insure themselves and each other. The excess of premiums collected from them belongs, in a mutual company, to them alone. An evil had grown up of forfeiting the policy holders' "reserve" and "surplus." Legislation was enacted to prevent it. In construing terms employed in the statute, they will be given the meaning which will remedy the evil, rather than a meaning which would leave it partly unremedied.

We conclude that, while "dividend additions" may have meant what appellant contends, the term also meant that fund from which "dividends" were declarable, to-wit: the surplus, whether it had been applied to buying additional insurance or not.

Petition overruled.