CHARLES E. FOWLER ET AL., APPELLANTS, V. SOVEREIGN CAMP, WOODMEN OF THE WORLD, APPELLEE.

FILED MAY 16, 1921. No. 21811.

1. **Insurance**: BENEFICIAL ASSOCIATIONS: CONSTRUCTION OF LAWS. Where the supreme legislative body of a fraternal benefit association has given a reasonable construction of an ambiguous provision of its laws, the court will adopt that construction.

2. ———: ———: INCREASE OF RATES. The "loading" of the rate of assessment of the members of such an association by the percentage method, instead of by the *per capita* method, is within the discretion of the association.

3. ———: ———: ———. A "loading" of the net rate to the extent of 15 per cent. for the purpose of paying expenses and to provide a fund as a factor of safety to guard against increased mortality from epidemics, or other unforeseen causes, is not excessive or discriminatory.

4. ———: ———: AMENDMENT OF BY-LAWS. The provision of the amended by-laws permitting a member physically disabled to surrender his certificate and to receive certain specified benefits does not violate section 3296, Rev. St. 1913, does not constitute "endowment insurance," and is not illegal.

5. ———: ———: LIEN ON BENEFITS. A method of readjustment of the affairs of such an association whereby a lien is placed upon the amount promised to be paid on the certificate is not invalid for that reason alone.

6. ———: ———: ASSESSMENTS: CHANGE OF PLAN. Sanctity does not attach to a mistake in mathematics, and it is not unlawful to change the method of operation of such an association from an inadequate assessment basis or plan to one based upon mathematical principles, even though the change involves the adoption of the "level premium" plan.

7. ———: ———: ———: ———. In such a readjustment it is proper to consider the likelihood that "adverse selection" will occur by reason of younger members of the association withdrawing to obtain cheaper insurance, and older members retaining their membership.

8. ———: ———: ———: ———. When it is considered that assessments may be omitted by the Sovereign Commander, if warranted by the condition of the funds, and that the association may readjust its rates at each biennial meeting of the Sovereign

Camp, a representative body, it will not be presumed that excessive or extortionate rates will in future be exacted from the members, and a court of equity will not declare the plan of readjustment adopted by the supreme legislative body void, unless it is clearly established by the evidence that it is illegal.

APPEAL from the district court for Otoe county: FREDERICK W. BUTTON, JUDGE. *Affirmed.*

*D. W. Livingston, Wilkerson & Barnett, Wilfley, Williams, McIntyre, Hensley & Nelson,* for appellants.

*William F. Moran, W. B. Price, Nelson C. Pratt, F. H. Gaines* and *D. E. Bradshaw, contra.*

LETTON, J.

Plaintiffs are members and certificate holders of the defendant, which is a fraternal beneficiary association incorporated under the laws of the state of Nebraska. The purpose of the action is to have the court declare that certain provisions of the constitution and by-laws of the order in force in 1917 are still in full force and effect, and that the constitution and by-laws claimed to have been adopted by the Sovereign Camp of the defendant at its session in Chicago in July, 1919, be declared unlawfully adopted; that sections 60 and 61 of said constitution and by-laws be declared unreasonable and discriminatory between members and classes of members, *ultra vires,* and void; and that defendant be perpetually enjoined from enforcing or attempting to enforce the provisions of said sections, or from collecting rates on any different basis than that provided in the laws of 1917; that it be enjoined from declaring or enforcing any lien upon the benefit certificates of its members, and from dissipating or disbursing its emergency funds by apportioning its accumulated funds among the members or permitting them to withdraw any portion of the same. From a decree refusing the relief prayed, the plaintiffs appeal.

At the outset of the argument it was conceded by the appellants that under the decision of this court in *Funk v. Stevens,* 102 Neb. 681, a fraternal beneficiary association

whose members had agreed in advance to any changes in the by-laws and constitution thereafter made has power to amend the same so as to increase the rates to be paid by its members, if the increase was reasonably necessary for the preservation of the order, or the successful carrying on of the purposes and objects of the association. It is also conceded that if the changes made by the amendments of the constitution or by-laws are unreasonable or confiscatory, and operate unjustly and wrongfully to deprive a member of the benefits of the insurance contract, or place undue and unreasonable burdens on one class of members from which others are exempt, such changes in the by-laws or constitution are beyond the power of the association to make without the consent of the persons affected and will be held void.

These principles being established, the questions left for determination are mainly questions of fact.

Appellants insist that the 1919 constitution and by-laws were not legally adopted, for the reason that section 164 of the constitution and by-laws then in effect provides that the same shall not be altered, "(a) unless the alterations or amendments are proposed in writing through Head Camps, and such proposals are received by the Sovereign Clerk at least 15 days prior to the next regular meeting of the Sovereign Camp, or recommendations by the Sovereign officers or members of the committee on legislation, which may be proposed at the session of the committee;" that such committee shall meet "(b) at least five days prior to the time of meeting of the Sovereign Camp to consider such proposed alterations and amendments. Such committee shall transmit them, together with its recommendations thereon in writing, and all other alterations and amendments which it may deem to be for the interest of this society, to the next regular meeting of the Sovereign Camp on the first day of its session. (c) The committee shall have its report printed in sufficient numbers to furnish a copy thereof to each officer and delegate of the Sovereign Camp on the first day of its

session.   (d) No other alterations or amendments to the constitution and laws shall be submitted to or considered by the Sovereign Camp, except by a two-thirds vote of all the members at a regular meeting thereof, unless presented in the manner hereinbefore provided.   And the constitution and laws of the Sovereign Camp shall not be altered or amended except by a two-thirds vote of all the members constituting the same at a regular meeting thereof, except as hereinbefore provided in this constitution and laws."

It is contended that the provision that a copy of the proposed amendments shall be placed in the hands of each delegate on the first day of the convention is mandatory and jurisdictional, and that this provision was not complied with, could not be waived, and hence the whole proceedings in this regard are void.

The evidence shows that the printed reports of the committee were distributed on the morning of the fifth day of the convention.   The report was at once taken up by a committee of the whole house, which considered the same during the day.   On the afternoon of the sixth day a roll-call was had on the adoption of the amendments to sections 60 and 61, which were carried by more than a two-thirds vote.   Consideration of the other amendments proceeded daily until the eighth day of the session, when a resolution was offered that the constitution, laws, by-laws and rules, which had been considered section by section, should be adopted as the constitution and by-laws from and after December 31, 1919.   A roll-call was had and the presiding officer announced that 212 votes had been cast for the adoption, that 12 Sovereigns were absent, and that the laws were unanimously adopted.

Since the amendments were not presented, nor the reports printed and distributed on the first day of the session, they evidently must fall under the class of "other alterations" provided for in subdivision "d."

The provision that "no other alteration or amendments" shall be submitted or considered, except by a two-thirds

vote, "unless presented in the manner hereinbefore provided," seems to be confusing and self-contradictory. The Sovereign Camp construed this language to mean that such "other" amendments might be submitted and adopted by a two-thirds vote of all its members. This seems to be a reasonable construction of an ambiguous provision by the supreme legislative body of the association, which the court will follow, the more so as there seems to have been nothing surreptitious, fraudulent or unfair in the proceedings leading up to the adoption.

It is alleged that the plaintiffs and interveners were paying the rates of assessments provided by the constitution, laws and by-laws enacted by the Sovereign Camp in 1917, which are now in force, and it is asserted that the changes in the rates and plan alleged to have been adopted in July, 1919, are void:

"(a) Because the rates of contribution therein imposed upon plaintiffs and other members are not fair, reasonable or just, in that they are higher than is reasonably necessary for defendant to pay its promised benefits and the legitimate expenses of doing business.

"(b) Because there is the rates of contribution therein imposed upon plaintiffs and other members, there is discrimination against older members and the existing members of defendant.

"(c) Because said sections and the plan of apportionment referred to there, change the fundamental plan of defendant from assessment or mutual benefit insurance to legal reserve or old line insurance.

"(d) Because the provision of said sections for the withdrawal of accumulated funds by members constitutes endowment insurance which as to defendant is *ultra vires*.

"(e) Because the provision contained in sections for charging liens against the certificates of members is illegal."

The evidence shows that the defendant now has outstanding certificates of the face value of more than $1,173,000,000, and that there is a large deficiency be-

tween the assets and the present worth of the future con-
tributions, and the present value of promised benefits.
It is undisputed that the percentage of solvency on De-
cember 30, 1919, was about 58 per cent., and that an in-
crease of rates is necessary if the defendant shall be able
to pay its promised benefits.

While, in substance, conceding that a change of rates is
necessary, the plan adopted is attacked and what is said to
be a better and more equitable plan is suggested by ap-
pellants.

Desiring to make the association 100 per cent. solvent,
the officers of the association called to their assistance
Mr. Abb. Landis, an experienced actuary, as to whom it
is stipulated by the parties:   "That he has been employed
by many fraternal societies and life insurance com-
panies to make the valuation of their business, and that
he has made such valuations, and that he has been em-
ployed by many fraternal beneficiary societies to construct
for them mortality tables and to prepare tables of rates
and plans of adjustment, and that he is competent to pre-
pare a mortality table and rates, based thereon."    And
it is further stipulated that the defendant furnished Mr.
Landis true records of its transactions for more than 20
years covering more than 100,000 lives, from which he
prepared its mortality table, and also commutation and
other tables.    Mr. Landis, in conjunction with Mr.
Macken, the actuary for defendant, and Sovereign Com-
mander Fraser, after much investigation and delibera-
tion, prepared and submitted to the Sovereign Camp of the
order the amendments here attacked.

Mr. Landis testifies that experience has shown that a
step rate of annually increased rates is not a practical
plan of insurance, for the reason that as the members
become old it becomes prohibitory, and it was desired to
have a level rate plan and at the same time an adequate
plan.    It was concluded that the best plan would be to
get a rate according to the risk assumed by the society
determined by attained age—"the plan therefore was to

make rates that would be adequate and apply them to attained ages, and then reduce them by whatever advance might become available from the mortuary funds of the society." He also testifies: From calculations made it was found that under the proposed rates the funds would be exhausted at age 38. The plan finally adopted was to make the rate adequate and then give the older members the benefit of the accumulations in the mortuary fund by using the same to reduce their rates after age 38. The greatest reduction was given to the members who had been in the society the longest time. Old age had a part in the apportionment, and duration of membership had part in it. This plan did not have anything to do with the "loading," because this is a managerial matter, and not an actuarial matter. The death rate fluctuates, and it was necessary to provide for a little surplus to take care of epidemics, or years of excessive mortality, and a shock is always caused by rerating so as to materially increase the rates.

Are the new rates discriminatory and unfair with respect to the older members? In a properly adjusted table of rates the natural premium, which is the premium which must be annually increased to meet increasing mortality, is a mathematical equivalent of the level premium. In the organization of nearly all fraternal associations they overlooked this indisputable fact, but by the force of circumstances they have been compelled to realize it. The evidence shows that, under the specified rates, each member carries his own insurance up to the age of 38 years. That is to say, while he pays more than the cost of his insurance in the early years, the payment for that entire term equals the loss from the average mortality. In order to relieve the older members of the society from paying the full cost of their insurance at their attained age on January 1, 1920, the plan apportions the accumulation in the emergency fund, amounting to about $30,-000,000, among the members then over the age of 38 years, for rate-making purposes; the theory being that, since the

older members had paid this money, or the greater part of it, into the society and accumulated this fund, it ought to be redistributed to them by applying the same in reduction of the actual cost to each of them of carrying their insurance during their later lives. Mr. Landis testifies that this was done in as equitable a manner as could be devised. In this he is corroborated by three other actuaries. We think this evidence preponderates, though the plan was of necessity an approximation only, and could not apply with absolute equality in each instance. So far as the net rate is concerned the evidence seems to justify such an apportionment. But it is said the gross rates are excessive and discriminate against the older members by reason of the fact that the net or "actuarial" rate is "loaded" to an unreasonable extent for expenses; that the new laws provide for the payment of expenses, not by a *per capita* tax, but by a percentage of the gross receipts, and that by this plan the loading is increased to such a degree for the older members that it practically forces them out of the society.

The evidence shows that all, or nearly all, level premium companies derive the money to meet current expenses in this manner, and that a number of fraternal societies use the percentage method, or a combination of the percentage and *per capita* methods, which perhaps comes nearest to doing exact justice to the older members. It is also in evidence that such societies when rerated are increasingly changing from the *per capita* or "constant" to the percentage, or to a combined method. At the low and inadequate rates collected when such associations had their beginning, a *per capita* tax was necessary, since 15 per cent. to 25 per cent. of the net premiums would be insufficient to pay the expenses of the association, but as mortality increased this plan was found by experience to be unfair and inadequate. The "loading" is for the purpose of covering expenses and contingencies. It is customary in many companies to consider the first year as a one-year term policy, and to use the difference between the net premium

for one year of term insurance and the actual premium collected to provide for the extra expenses necessitated by placing the insurance contract in force. The expenses incurred at, and incidental to, the inception of the contract are much greater for the same period of time than the ordinary expense of carrying the contract. At the maturity of the contract by death, other expenses are necessarily incurred, such as investigation of the facts, determination of the real beneficiaries, contest of fraudulent claims, etc., which usually necessitate a greater outlay during the last year of the term than during any year but the first. As the age of the members increases the mortality increases, so that the expense is larger in proportion during the latter years of the membership. The "loading" is not increased each year, but when a man is young it is considered that the expense of carrying the risk will be distributed over a long series of years, and since the rate is low the amount produced by the percentage is small each year, but a great deal in the aggregate; while if a man enter at age 50, or later in life, the expense must be paid for in a shorter time. While the percentage remains the same, the net premium having increased, the amount he pays at one time is larger, but it may produce no greater sum in the aggregate than that collected from the younger men.

The mortality table of the society is shown to be low in comparison with the American Experience and other standard tables, and it would appear to be too low when the experience of the years of the epidemic of influenza and the world war is considered. The evidence convinces us that, while the experience of the society as set forth in this table must be considered, sound actuarial policy, would not accept this as absolutely correct, and it is the part of wisdom to add a factor of safety to any rate based upon this table. Epidemics are not usually foreseen, but it is necessary to assume they will come and to provide against them.

The practice of this society for 17 years has been to

take a percentage of the gross receipts for expenses.   No change of the principle was made in that respect.   Four actuaries have testified that the percentage method is fair and equitable, and that, since the Mobile bill and the New York Fraternal Congress bill have been put into effect, a great change has taken place in the method of business of fraternal societies in most states of the Union.   Plaintiffs have not established that such a method of providing for the expenses of the association, and for an additional factor of safety with respect to mortality, is unreasonable or discriminative, or that the "loading" is so excessive that it is unfair.   If experience demonstrates that the amount collected for these purposes is in excess of that which is necessary, the members themselves have the means and the power to adjust rates to mortuary requirements through their representative governing body, which meets biennially.   Also the Sovereign Commander may omit any assessment if the finances of the Sovereign Camp justify such action, and proper conduct on the part of the officers of the society must be presumed until the contrary is shown.

The point that the changes made allow endowment insurance, which, it is said, is not permitted by the statutes of this state, is not well taken.   The withdrawals permitted are not *ultra vires*, as claimed.   Section 3296, Rev. St. 1913, provides that such a society "may make provision for the payment of benefits in case of sickness, temporary or permanent physical disability, either as a result of disease, accident or old age: *Provided,* the period of life at which payment of physical disability benefits *on account of age* commences shall not be under seventy years."   There is nothing here to prevent a member who becomes permanently and totally disabled prior to his attaining the age of 60, as permitted by the new laws, from surrendering his certificate and receiving in settlement one-half of the face amount of his certificate, less indebtedness due to the society, as a permanent total disability benefit, and there is no provision in the amendment which

gives to a member who is not disabled the right to withdraw and receive any amount as the surrender value of his certificate, or as a payment in the nature of an endowment. The proposed change in the by-laws does not conflict with the statutes, and this objection is without merit.

It is complained that the laws of 1919 impose a lien upon the certificates of older members without authority, and that such method of adjustment is illegal and void. A large number of cases are cited to sustain this position, but a critical examination of these shows that they are inconsistent with the law of this state as laid down in *Funk v. Stevens,* 102 Neb. 681, and *Case v. Supreme Tribe of Ben Hur,* p. 220, *post,* and are also inconsistent with the concessions made by appellants set forth in paragraph 2 of this opinion.

By the laws of 1917, upon which plaintiffs stand, a somewhat similar provision is made which in effect constitutes a lien upon the certificate.

In *Shepperd v. Bankers Union of the World,* 77 Neb. 85, the court said: "In the case under consideration the society said to its old members: We will not require you to pay the additional assessment from month to month as in the case of new members, but will charge you up with the additional amount and deduct it from the face of your certificate at the date of death." This was held not to be illegal. *Wright v. Minnesota Mutual Life Ins. Co.,* 193 U. S. 657; *Polk v. Mutual Reserve Fund Life Ass'n,* 207 U. S. 310. Furthermore, the liens provided for are only to be imposed with the consent of the member. If he would rather pay the actual cost of carrying his insurance at his attained age on January 1, 1920, he may do so. The changes are not invalid because of this provision.

It is argued that the new plan constituted a change from fraternal or assessment insurance to level premium, or what is known as "old line" insurance, and is therefore void, and that the proposed increase is higher than necessary. Originally the plan of insurance adopted by fra-

ternal beneficiary societies was impracticable and unscientific, and time demonstrated that, in order to fulfil the agreements of such a society, its plan of operation must of necessity be based upon mathematical principles. Sanctity does not attach to a mistake in mathematics. The originators of the plan and those who participated in it were both innocently mistaken, and the society has the right to change it to accord with sound principles. The evidence shows that certain old line companies and a number of fraternal benefit associations have higher rates than these attacked, and that the rates of a number of fraternal companies are lower. Appellants say these facts are of no importance, since that which controls is the needs, experience and condition of the defendant. This is true, but the officers of the defendant are justified in taking advantage of the experience of other societies engaged in a like enterprise, and they are entitled to consider every factor and element of the insurance business as disclosed by the experience of all engaged therein. It is a business of contingencies and probabilities, and experience is the most potent factor to consider in placing it upon a plane of safety.

That the society may exist for several years without a change of rates does not prove that the new rates are excessive. It is shown that a substantial increase of rates in a fraternal society often results in "adverse selection," the younger men leaving it and procuring insurance in a competitive association having lower rates, and the older members, many of whom are unable to procure other insurance, perforce remaining. The ratio of mortality becomes consequently greater and the mortuary payments and expenses are increased. The result of the 1919 change had to be anticipated and provided for, and not until the force of the shock is spent can it be determined with any degree of accuracy whether these rates are excessive. If they produce an excess of funds, the assessments will be reduced in number, or the rates or liens reduced, because it must be presumed that an insurer who is also the in-

First Nat. Bank v. Anderson.

sured will not impose upon itself or upon its members undue hardships, and that the governing body will in future be as anxious to relieve its membership from unnecessary burdens as it has been to provide means to fulfil its insurance obligations.

Some of the cases supporting the principles announced are: *Reynolds v. Supreme Council, Royal Arcanum,* 192 Mass 150, 7 L. R. A. n. s. 1154, and note; *Supreme Council, Royal Arcanum, v. Green,* 237 U. S. 531; *Supreme Lodge, Knights of Pythias, v. Mims,* 241 U. S. 574; *Supreme Lodge, Knights of Pythias, v. Smyth,* 245 U. S. 594; *Smith v. Mutual Reserve Fund Life Ass'n,* 140 Ill. App. 409; concurring opinion, Dawson, J., in *Williams v. American Ins. Union,* 107 Kan. 214; *Clarkson v. Supreme Lodge, Knights of Pythias,* 99 S. Car. 134; *Wineland v. Knights of Maccabees,* 148 Mich. 608; *DeGraw v. Supreme Court, I. O. F.,* 182 Mich. 366; *Hall v. Western Travelers Accident Ass'n,* 69 Neb. 601; *Sawyer v. Sovereign Camp, W. O. W.,* 105 Neb. 395.

The judgment of the district court is

AFFIRMED.