JOSEPH WALL et al., Plaintiffs, v. BANKERS LIFE COMPANY OF DES MOINES, Appellee, et al., Appellants (and two other cases).

No. 38892.

1054

January 23, 1929.

Rehearing Denied September 24, 1929.

*John M. Stewart, John W. Stewart,* and *R. & F. G. Ryan,* for William A. Lindly *et al.,* appellants.

*J. G. Mitchell,* for Curtis Boughton, intervener, appellant.

*Roberts & Roberts* and *W. H. Keating,* for Arthur Hightshoe *et al.,* interveners, appellants.

*Allen G. Fisher,* for Frederick S. Baird, intervener, appellant.

*Charles S. Bradshaw, W. S. Ayres,* and *R. B. Alberson,* for Bankers Life Company, appellee.

*Howard L. Bump, Parsons & Mills, Clarence I. Spencer,* and *Salinger, Reynolds & Meyers,* for Joseph Wall *et al.,* plaintiffs.

*Vernon W. Lynch,* for J. J. Lynch and L. J. Klemm *et al.*

*C. H. E. Boardman* and *Ray P. Scott, Amici Curiae.*

KINDIG, J.—The primary dispute in this litigation arises over the contractual rights of the plaintiffs-appellants, Joseph Wall *et al.,* William A. Lindly *et al.,* and Curtis Boughton, and the interveners-appellants, J. J. Lynch, L. J. Klemm *et al.,* Arthur B. Hightshoe *et al.,* and Frederick S. Baird, as certificate holders in the Bankers Life Company of Des Moines, a mutual insurance corporation, defendant-appellee. Consolidation was made of the several suits. A solution of the problem, therefore, involves the specification of those rights and the determination as to whether or not there has been any infringement thereof on the part of the insurance company. To accomplish this, it is quite necessary to study the history of appellee's organization, including the state Constitution and statutes which controlled or made possible its existence.

On June 24, 1879, the appellee was duly incorporated in

this state as a mutual benefit life assessment concern, under the name "Bankers Life Association." As declared in its articles of incorporation, the purpose of the association was as follows:

"The object of this association shall be the creation of a fund for making mutual pledges and giving valid obligations of the members to each other for their own insurance from loss by death, the preservation of the funds from mismanagement and loss by the judicious investment of the same in registered bonds of the United States, and the equitable distribution of that fund among the families or designated beneficiaries of deceased members."

Control of the company was, by these articles, vested in a board of five directors. By-laws were duly authorized.

Basis for this corporate formation was the following provision of the 1873 Code, as amended by Chapter 104, Acts of the Seventeenth General Assembly:

"Section 1160. Nothing in this chapter shall be so construed as to prevent any number of persons from making mutual pledges and giving valid obligations to each other for their own insurance from loss by fire or death; but such association of persons shall in no case insure any property not owned by one of their own number, and no life except that of their own numbers, nor shall the provisions of this chapter be applicable to such associations or companies. * * * but such associations or companies shall receive no premiums nor make any dividends; but the word premiums herein shall not be construed to mean policy and survey fees, nor the necessary expenses of such companies."

Subsequently, Chapter 65 of the Laws of the Twenty-First General Assembly was passed, as an amendatory act to regulate mutual benefit associations. That chapter later was embodied in Chapter 7 of Title IX of the 1897 Code, and is now embraced within Chapter 400 of the 1924 Code.

By virtue of this enabling provision, the appellee, in November, 1886, amended its original articles of incorporation by enlarging upon and more definitely defining its method of operation so as to include the creation of the following funds: Guaranty, benefit, surplus, and contingent. After this, on March 21, 1907, the legislature passed the following act:

"Section 1. No life insurance company or association, other than fraternal beneficiary associations, which issues contracts, the performance of which is contingent upon the payment of assessments of call made upon its members, shall do business within this state except such companies or associations as are now authorized to do business within this state and which shall value their assessment policies or certificates of membership as yearly renewable term policies according to the standard of valuation of life insurance policies prescribed by the laws of this state."

"Section 2. Any existing domestic assessment company or association may, with the written consent of the auditor of state, upon a majority vote of its trustees or directors, amend its articles of incorporation and by-laws in such manner as to transform itself into a legal reserve or level premium company, and upon so doing and upon procuring from the auditor of state a certificate of authority, as prescribed by law, to transact business in this state as a legal reserve or level premium company, shall incur the obligations and enjoy the benefits thereof, the same as though originally thus incorporated, and such corporation, under its charter as thus amended, shall be a continuation of such original corporation, and the officers thereof shall serve through their respective terms as provided in the original charter, but their successors shall be elected and serve as in such amended articles provided; but such amendment or re-incorporation shall not affect existing suits, rights or contracts. Any assessment company re-incorporated to transact life insurance business, shall value its assessment policies or certificates as yearly renewable term policies according to the standard of valuation of life insurance policies prescribed by the laws of this state." Chapter 83, Acts of the Thirty-Second General Assembly.

Other states (wherein appellee was operating) had taken the position that assessment insurance of the kind written by the Bankers Life Company was unsafe, and ultimately sure to fail, because not based upon cost; so it became more difficult, as time went on, to convince prospects that they should accept this kind of insurance. Furthermore, the officers of the Bankers Life Company received expert advice to the effect that the assessment plan, as inaugurated, was destined to be unsuccessful, and that

the company, therefore, could not long endure. In order to avoid such catastrophe, and in harmony with the legislation last above quoted, appellee decided to "transform itself" from the mutual assessment plan "into a legal reserve or level premium company," and for that purpose adopted articles of incorporation, including the following:

"The purpose and intent of this amendment is to transform this corporation into a legal reserve or level premium, mutual insurance company, as provided by Section 1798-b of the Supplement to the Code, 1907, and its business shall be that of life insurance on the mutual plan, as a legal reserve or level premium company, and it shall have and possess, full power to transact and conduct every kind of mutual life insurance provided for or permitted under Chapters One, Six and Eight, of Title Nine, of the Code of Iowa of 1897, and all amendments thereto now or hereafter adopted, and shall be a continuation of the original corporation and retain all its original rights, powers, privileges and franchises, so far as may be necessary to carry out all its contracts, heretofore made with its members including the issuance of certificates upon examinations made at the time these articles become in force, as such association, and this amendment shall not be construed to affect existing suits, rights or contracts, and these articles are and shall be construed as, a substitution for the original articles, except in so far as the rights of existing members are concerned."

By-laws were passed and all other necessary steps taken for completing the reorganization, so that henceforth the appellee was the Bankers Life Company, authorized to transact business as a legal reserve or level premium concern. At the time of this transition, the appellants and interveners held assessment certificates under the old form.

New contracts for all incoming members thereafter were written under the level premium or legal reserve scheme, rather than the old assessment idea. Many of the certificate holders transferred to the legal reserve and level premium method. Consequently, young members ceased coming into the assessment part of the organization, and those certificate holders remaining therein were caused to bear the burden of the death losses under that department. Resultantly, the reserves became depleted, and

it was necessary to increase the rates to be paid by the assessment members, in order to satisfy the death benefits accruing thereunder. So there were finally made by the company assessment calls 176 and 177, payable respectively in April and July, 1927.

Because of this, appellants demand an injunction restraining such collection, and in behalf thereof, now argue: First, that they cannot be affected by the changed insurance system, and that the assessment for their benefit must be spread over all the membership of appellee, including the new legal reserve or level premium policyholders, as well as the old assessment members: second, if this is not true, appellants contend that the legislation authorizing the transformation is unconstitutional because impairing the obligation of their contractual rights; and third, that the new company has not properly used the assets and properties of the institution held at the time the reorganization was completed.

Those disputes were determined by the district court in favor of the appellee and against appellants. Hence this appeal is taken. Such are the problems confronting us for solution.

I. Rights and liabilities of the assessment certificate holder are fixed by the certificate contract, including appellee's articles of incorporation and legally adopted by-laws. With equal certainty, the advantages and burdens of the level premium or legal reserve policy owners are defined by their contracts.  *Dishong v. Iowa Life & Endowment Assn.*, 92 Iowa 163. Constitutional guaranties of preservation and security guard and shield each and every element of both contracts. But such safeguard does not arm either party with the privilege of legally having or enjoying any claim or equity not fairly embodied within its agreement. Neither security thus afforded by the Constitution nor liberal contractual interpretation will permit one class of such members to nullify, change, or abridge the contracts of the other. Each group is entitled to the fulfillment of its agreement, may enjoy the benefits thereof, and must carry the responsibilities thereunder. Liability, if any, owed by the legal reserve or level premium members to those of the assessment division must be founded upon, defined, and determined by contract. Do the former owe any obligation to the

latter in reference to relieving them from assessments necessary to pay the death losses of their branch?

II. Appellants contend that an affirmative answer to that interrogatory is necessary because of the indication to that effect contained in the following exception added to Section 2 of Chapter 83, Acts of the Thirty-Second General Assembly:

"But such amendment or re-incorporation [allowing the change from the assessment company to the legal reserve or level premium institution] shall not affect existing suits, rights, or contracts."

"Rights and contracts" there referred to, they conclude, embrace the power to assess level premium members. Designation of the "rights and contracts" to which allusion is thus made was not supplied by the legislature. Evidence as to what was actually reserved thereby must be sought elsewhere. But beyond a peradventure of a doubt, the statutory limitation was adopted to preserve, rather than to create, contractual relationships. "Existing," as used by the lawmakers in this instance, definitely settles that controversy.

III. Continuity of the scheme requiring the mortality of assessment members to be figured upon the basis of the institution's entire membership is asserted by appellants as constitut- ing their contract embodied within the statutory "reservation" just discussed. Otherwise, they say, the reorganization wrongfully set them off in a class by themselves, and accordingly denied them the advantages of "new blood." Two classes, they state, under such circumstances would be created in consequence thereof, which, according to their theory, has previously been condemned by this court in *Tusant v. Grand Lodge A. O. U. W.*, 183 Iowa 489; *Tusant v. Grand Lodge A. O. U. W.*, 192 Iowa 1232.

An analysis of the facts involved in the cited cases and those embodied in the cause at bar will clearly reveal distinguishing features. Confronting the court in the *Tusant* cases was a situation where the fraternal insurance organization attempted to separate its assessment members into Classes A and B (as distinguished from the creation of a different kind of insurance), so and in order that one group contained the old, and the other

the young. Statutory authorization did not exist for this manipulation, and that was an important factor in our discussion.

*Tusant v. Grand Lodge A. O. U. W.* (183 Iowa 489), supra, contains this language:

"There was no legitimate reason for such division. The two divisions thus created occupied the same field of insurance, and were necessarily competitive and hostile. * * * Authorities are brought to our attention by the defendant, holding contrary to the views herein expressed. Practically all of such decisions, however, are based either upon statutory provisions of the respective states or upon by-laws of the order, none of which are applicable here."

Legislative enactments previously quoted intervened for the benefit of appellee in the case at bar, for by such enabling acts it was authorized to transform itself from an assessment company into that of a legal reserve or level premium entity. Previous to this legislation, appellee was prohibited by statute from being anything but an assessment corporation. Fundamentally, the very purpose of the lawmakers in enacting Chapter 83 of the Thirty-Second General Assembly, supra, was to remove such prohibition, and substitute in lieu thereof authority to reorganize and write old line or level premium insurance, instead of issuing assessment certificates. Future prospects had a right to contract with appellee for level premium or legal reserve insurance, free from any burdens of assessment. Such was the very object of the new legislation. Without this right, the result would not have been level premium or legal reserve insurance, and the purpose to be accomplished by the statutory amendment would have been thwarted. See *Dishong v. Iowa Life & Endowment Assn.,* supra. Legal reserve and level premium insurance was permitted by the statute "the same as though" appellee was "originally thus incorporated." See Section 2, Chapter 83, Acts of the Thirty-Second General Assembly, supra. "Originally thus," as therein used, eliminate any legislative intention to incumber the policyholders with assessment certificates. But in the *Tusant* cases the attempt was made, without legislative permission, to divide the company into two parts for assessment purposes, in violation of the contract of the members, which provided that the assessment for that sort of insurance should be levied against all

the members of like kind. *Tusant v. Grand Lodge A. O. U. W.* (183 Iowa 489), supra, embodies this additional phraseology:

"* * * they [the old members] challenge its power to charge the mortality of the order against the older membership; they challenge its power to make an amendment so fundamental as to change the essential character of the order, by converting it from a mutual assessment company, paying death losses when they occur, to what, in practical effect, is an old-line investment company; * * * We think it was an abuse of power to divide the membership of the order into two divisions, upon the basis which was actually adopted. There was no legitimate reason for such division. The two divisions thus created occupied the same field of insurance, and were necessarily competitive and hostile. * * * The question involved in this litigation, therefore, is not so much the power of the order to make sufficient assessments to pay all death losses; it is, rather, whether the methods adopted by it are unreasonable, as being discriminatory, and therefore unfair. * * * But the question is whether it is not fundamentally different from the plan of mutual insurance contemplated by above Chapter 9 [Chapter 9, of Title 9, Code, 1897]. If it is, the defendant order had no power to adopt it, or to impose increased rates for its maintenance."

Following that pronouncement, *Tusant v. Grand Lodge A. O. U. W.* (192 Iowa 1232), supra, consistently says:

"The mere fact, therefore, that the defendant lodge made three assessments in a month, instead of *one*, does not, of itself, condemn its action. The controlling consideration, which the defendant seems to have ignored, is: What was the current mortality of the order? Did the defendant assess these plaintiffs in greater amounts than were necessary to pay actual death losses? The only data in the record which tends to furnish an answer to this question is that, after the enactment of the amended by-law of 1911, the defendant began to build up a reserve, and that such reserve had steadily grown until, in the year 1919, it amounted to more than a million dollars. These plaintiffs had contracted for mutual assessment insurance. Under that plan, each was liable to pay assessments for the death of all members predeceasing him. * * * This is the kind of insurance they con-

tracted for. They are neither entitled to nor liable for anything more or better. This was our adjudication in the former case [*Tusant v. Grand Lodge A. O. U. W.*, 183 Iowa 489].''

Clearly it appears that the *Tusant* cases are not authority in the cause before us for the propositions urged by appellants. Classes attempted to be devised in the *Tusant* cases were illegal and void, because there was no statutory authority to thus divide existing assessment members. Moreover, the membership agreements there demanded that the assessment be spread against the entire membership, which was of one kind. Contrary to that, in the case at bar the assessment members are not divided; they are maintained in unity. No contract right is violated, because the legal reserve members did not agree to pay assessments, and the assessment agreements did not demand them to. Legal reserve members undertook to pay premiums, as distinguished from the assessments to be met by the certificate holders. Rather than making a division of its assessment members, appellee preserved the ''oneness'' thereof, and equipped itself to create in addition thereto a level premium or a legal reserve membership. Here the legal reserve or level premium policyholders are not a part of the assessment membership, but separate and distinct therefrom.

Due to the statutory enablement and the different insurance agreements, as well as the very nature of the two memberships themselves, the distinction is furnished between this and the *Tusant* cases. Division in the cases just cited was held to be illegal and void, and because thereof, the assessment was spread over the entire membership, for that was the original contractual undertaking of the parties; but this result cannot be reached in the present cause, because here there is no division, but rather, two separate and distinct kinds of membership. One was created under a law prohibiting the other, and the second was brought forth under a legislative act discouraging the one and making legitimate the other. Wherefore, if the enabling act is void (but we hold it is not), the second group have no existence at all, because they never were assessment members. Had appellee's membership been composed entirely of assessment certificate holders, and an illegal division thereof attempted, a judgment of court setting aside the void act would leave all certificate holders together, subject to the same assessment, as was the situation in

the *Tusant* cases. That is true because originally both so-called classes were identical. However, appellee's level premium or legal reserve members never were a part of the assessment membership. Therefore, the illegality (if there is any) of the legislative act creating them could not throw them over into a membership of which they never were a part. Contractual obligations prevent such result.

So, appellants at the time of the reorganization did not possess that alleged right of "continuity" as an "existing" "right or contract" under Section 2 of Chapter 83, Acts of the Thirty-Second General Assembly, supra. Doctrines announced in the *Tusant* cases are harmonious with this pronouncement, and the philosophy of those decisions does not guarantee appellants here the right to thrust upon the legal reserve or level premium policyholders the assessment burdens aforesaid.

IV. This conclusion on the statutory "reservation" is adopted by appellants as a basis for their argument that Section 2 of Chapter 83, Acts of the Thirty-Second General Assembly, supra, is unconstitutional. Their reasoning at this point is based upon the ground that they have a contract for or vested rights demanding the perpetual existence of the insurance corporation as a mutual assessment institution, and as a result, the level premium or legal reserve policyholders are liable for some part of the losses accruing under the assessment certificates.

Parenthetically, we note that, if there was lack of authority in this regard because of constitutional prohibition against appellee's reorganization on the level premium or legal reserve basis, that corporate incapacity would not confer upon the assessment members the right to compel contribution from those holding said illegal contracts. The misfortune thereby befalling the level premium member could not, by any mystic or supernatural process, transform him into an assessment member without his consent and against his will, but rather, this victim of the *ultra vires* transaction (if it were such) would, in that event, be entirely without the sanctuary of appellee's shelter and refuge. While, through the suggested illegality contained in the supposition, the legal reserve or level premium applicant could never have become a member, he, of course, in that event would not be permitted to have the benefits of appellee's insurance, and

as a corollary thereto, he would not be liable for any obligations thereof.

V. Reliance need not be placed upon the consequence of that analysis alone, because the perpetual existence of the assessment scheme was not a contractual right of appellants', and the act creating the power permitting appellee to reorganize is constitutional.

Iowa, in the year 1857, adopted its Constitution, containing Sections 1 and 12 of Article 8, which provide, respectively:

"Section 1. No corporation shall be created by special laws; but the general assembly shall provide, by general laws, for the organization of all corporations hereafter to be created, except as hereinafter provided."

"Section 12. Subject to the provisions of this article, the general assembly shall have power to amend or repeal all laws for the organization or creation of corporations, or granting of special or exclusive privileges or immunities, by a vote of two thirds of each branch of the general assembly; and no exclusive privileges, except as in this article provided, shall ever be granted."

Pursuant to that constitutional provision, the legislature of Iowa enacted Section 1090 of the 1873 Code, which reads:

"The articles of incorporation, by-laws, rules, and regulations of corporations hereafter organized under the provisions of this title, or whose organization may be adopted or amended hereunder, shall, at all times, be subject to legislative control, and may be, at any time, altered, abridged, or set aside by law, and every franchise obtained, used, or enjoyed by such corporation, may be regulated, withheld, or be subject to conditions imposed upon the enjoyment thereof, whenever the general assembly shall deem necessary for the public good."

Section 1090, just quoted, is a part of Title IX of said Code, and Section 1160 of that Code is included within the same title. It was under the latter provision that appellee was organized. An unlimited corporate franchise was prohibited by those quoted sections of the Constitution and the statute. Changes were authorized, and all contracts in the premises between the state and the corporation were subject to the state's right to "amend or

repeal.'' Upon this basis, appellee became a corporate entity, and those sections of the Constitution and statute were a part of its charter by that reference, as much as if expressly written therein by its founders. *Sioux City St. R. Co. v. City of Sioux City,* 78 Iowa 367; *Sioux City St. R. Co. v. City of Sioux City,* 78 Iowa 742; *Wood & Duvall v. Iowa B. & L. Assn.,* 126 Iowa 464; *Marshalltown Light, P. & R. Co. v. City of Marshalltown,* 127 Iowa 637; *St. John v. Iowa Bus. Men's B. & L. Assn.,* 136 Iowa 448; *Des Moines City R. Co. v. City of Des Moines,* 152 Iowa 18; *State ex rel. Shaver v. Iowa Tel. Co.,* 175 Iowa 607; *Iowa R. & L. Co. v. Jones Auto Co.,* 182 Iowa 982. See, also, *Wright v. Minnesota Mut. Life Ins. Co.,* 193 U. S. 657; *Polk v. Mutual Reserve Fund Life Assn.,* 207 U. S. 310; *Leininger v. North American Nat. Life Ins. Co.,* 115 Neb. 801 (215 N. W. 167); *Looker v. Maynard,* 179 U. S. 46; *Tomlinson v. Jessup,* 15 Wall. (U. S .) 454; *Sioux City Street R. Co. v. Sioux City,* 138 U. S. 98; *Stanislaus County v. San Joaquin & K. R. C. & I. Co.,* 192 U. S. 201.

Infringement of vested rights or the impairment of the obligation of contract could not arise in the premises, because of the corporate change authorized by Chapter 83, Acts of the Thirty-Second General Assembly, supra, and appellee's reorganization thereunder. Rather than impairing such obligation and interfering with vested rights, the amendatory statute and the resulting insurance change were in conformity with the constitutional and statutory provisions which became a part of and remained in appellants' and interveners' certificates of insurance. Appellee's existence, then, as an assessment company need not be perpetual. *Looker v. Maynard,* supra; *Wright v. Minnesota Mut. Life Ins. Co.,* supra; *Polk v. Mutual Reserve Fund Life Assn.,* supra; *Case v. Supreme Tribe of Ben Hur,* 106 Neb. 220 (184 N. W. 75); *Wirtz v. Sovereign Camp, W. of W.,* 114 Tex. 471 (268 S. W. 438); *United Order of Foresters v. Miller,* 178 Wis. 299 (190 N. W. 197); *Green v. Insurance Co.,* 139 N. C. 309 (51 S. E. 887).

*Looker v. Maynard,* supra, referring to the constitutional reservation to make change in corporate statutes, states:

''The effect of such a provision, whether contained in an original act of incorporation or in a constitution or general law subject to which a charter is accepted, is, at the least, to reserve

to the legislature the power to make any alteration or amendment of a charter subject to it which will not defeat or substantially impair the object of the grant or any right vested under the grant, * * * or to protect the rights of the public or of the corporation, its stockholders or creditors, or to promote the due administration of its affairs.''

*Polk v. Mutual Reserve Fund Life Assn.,* supra, consistently follows in these words:

''This case [*Looker v. Maynard,* supra] shows that it is immaterial whether the power to alter the charter is reserved in the original act of incorporation or in the articles of association under a general law or in a constitution in force when the incorporation under a general law is made * * *.''

*Wright v. Minnesota Mut. Life Ins. Co.,* supra, aptly concludes:

''There was no vested right to a continuation of a plan of insurance which experience might demonstrate would result disastrously to the company and its members. We are cited to the statutes of many states authorizing similar changes and transfer of membership, but to no case holding legislative authorization of a change of this character to work the impairment by the state of the obligation of a contract.''

Following this pronouncement, the Supreme Court of the United States, in *Polk v. Mutual Reserve Fund Life Assn.,* supra, declared:

''The whole argument of the complainants upon these constitutional questions, though enveloped in many words and presented in divers forms, rests upon a single proposition. That proposition is that they, having become members of an association insuring lives upon the co-operative and assessment plan, and being, therefore, in a sense, both insurers and insured, have a vested right that the Association shall not, without their consent, engage in other kinds of insurance, which may, and probably will, indirectly affect, for better or worse, their relations to it. The trouble with this proposition is that it was made and denied in the *Wright* case.''

See, also, *Supreme Lodge, K. of P. v. Mims,* 241 U. S. 574, and *Richards v. Security Mut. Life Ins. Co.,* 259 Fed. 727. *St. John v. Iowa Bus. Men's B. & L. Assn.,* supra, conformably says:

"It [the corporation] had no constitutional or other right to continue in business indefinitely, or for any other time than the legislature might see fit to permit. This is a fundamental principle of corporate law, under the reserved power now generally given to the legislature."

Experience with mutual assessment companies was such as to suggest to the Iowa legislature that it was "necessary for the public good" (see Section 1090, Code of 1873) to pass Chapter 83 of the Acts of the Thirty-Second General Assembly. Many of such institutions had failed, and the reason universally was that the insurance was granted at a price below cost. Catastrophe for the scheme was certain under those conditions. Constantly warning appellee was the experience of these failing institutions. Too, it knew that the legislature of this state, as well as those of others, had passed special acts prohibiting or discouraging the further organization of insurance companies under that particular plan. Actuaries informed it that the assessment scheme must fail, because of the faulty foundation thereof. Under those circumstances, appellee was justified in reorganizing, by authority of the permissive legislation, in order that it might continue in the future as a level premium or legal reserve company, and in so doing, it did not violate either the state or Federal Constitution, protecting vested rights or contractual obligations.

VI. Manifestly, there is no contract requiring the level premium or legal reserve participants to pay an assessment or any part of the death loss for those under the old plan. There is the prohibition against the impairment of the obligation created by the agreement giving rise to the level premium or legal reserve policy, the same as that protecting any other contractual undertaking. This is self-evident.

We cannot cast upon the level premium or legal reserve members a burden which they did not assume, nor have the assessment certificate holders any contractual right to demand such an imposition. Obligations to pay insurance costs, whether assessment, legal reserve, or level, as before stated, must arise through

contract, which, in turn, necessarily is based upon the meeting of minds. Were it otherwise, the result would be arbitrariness and injustice. No evidence is produced in this record that in any way suggests such consent on the part of the legal reserve or level premium members to be thus assessed. Like any other party to a business transaction, these policyholders have a right to their bargain. They did not desire, nor did they procure, assessment insurance, but rather, they wanted and bargained for that which is diametrically opposed thereto, the level premium or legal reserve protection, and to this they are entitled. Less than that would amount to infringement of an existing right, which the courts are bound to protect, rather than destroy.

The rights belonging to the certificate member through his contract are that: First, his death loss shall be paid out of the common fund named in the certificate and accumulated by assessments quarterly imposed on the assessment membership; second, the guaranty deposit should be paid to the beneficiary upon the member's death, if he died while in good standing; and third, the benefit, guarantee, contingent, and emergency reserve funds, and other properties, should be used in the manner provided by the articles of incorporation and legally adopted by-laws. Of necessity, then, the catalogue of "rights" just made embraces and constitutes (so far as appellants are concerned) the "existing * * * rights or contracts" reserved and excepted from the operation of said Section 2 of Chapter 83, Acts of the Thirty-Second General Assembly, supra.

Consequently, it is plain that the legislative enactments authorizing appellee to write level premium or legal reserve insurance were and are legal and valid, and the policyholders thereunder are possessors of contracts which can be enforced according to the terms thereof, without any impairment or abridgment. Contribution from the legal reserve or level premium branch, by way of assessment or otherwise, can in no event be legally demanded or obtained by the assessment members. By thus deciding, we have preserved in every way appellants' entire contract in this transaction, without permitting transgression thereof by the level premium or legal reserve policyholders.

·VII. Assuming that appellants do not have such contractual rights as an original proposition, yet they maintain that they are entitled to them through the doctrine of estoppel. According-

 ly, much evidence was introduced at the trial in the district court to show declarations and writings on the part of appellee of such character as to result in a contract, when taken in connection with appellants' acceptance thereof and reliance thereon. It is the claim of appellants at this juncture that, therefore, an estoppel arose, preventing appellee from denying to appellants the right to have their assessments spread over the entire membership of the company, including not only the assessment certificate holders, but also those possessing legal reserve and level premium policies. These written and oral statements and the resulting contracts were purported to have been made at the time of and immediately after the reorganization. Statements and representations, if any there were, must be laid, under this record, at the door of the corporation, as distinguished from the legal reserve or level premium members; for it is not charged that the policyholders did anything which would tend to bar them from denying this right of general assessments. Likewise, if appellee is liable to appellants because of such estoppel, it therefore cannot be to such extent as to interfere with the policy contracts of the legal reserve or level premium members. So, if the alleged agreements resulting from those declarations amounted to an *ultra vires* contract, they cannot be enforced.

The issue clearly is as to whether or not such obligations above described amount to a managerial or operating expense, as distinguished from an insurance contract which the appellee did not have the authority to make, because, under the reorganization, appellee was permitted and empowered to write level premium or legal reserve insurance only. Manifestly, if appellants are to succeed on this basis, it must be upon the theory that the estoppel agreements aforesaid amounted to and are new contracts of insurance, as distinguished from the original assessment certificates. Concerning whether or not, in any event, the policyholders could be bound by an estoppel on the theory of benefits, we do not now decide, because, under this record, advantage or gain does not appear.

Do the issues thus presented warrant the relief prayed? We think not.

VIII. Estoppel is predicated upon the fact that appellee, at the time of its reorganization, told the auditor of state direct-

ly, and its assessment members indirectly, through written circulars and communications with agents, that it would not place such participants in a class by themselves, deny them the benefits of "new blood," or require them alone to pay their own death losses, but that both classes of members would be considered as one, for the purpose of arriving at the basis for mortality costs.

Relief here sought is on the theory of a contract arising from those representations and By-law 11 (this by-law was afterwards repealed), adopted in an effort to make an adjustment consistent therewith between the two memberships; and it is attempted to have appellee estopped from refusing to carry out that agreement. By-law 11 is not relied upon by appellants as a part of the original agreement, for it appears that it does not go as far as the alleged estoppel contract; but, as we understand, that by-law is relied upon by appellants as evidence that the estoppel agreement did exist. Doubt arises as to the sufficiency of the proof to show offer and acceptance at this point. Still, for the purposes of this case, we assume, without deciding, the existence of such an attempted compact. Yet appellants cannot be aided, for the reason that, under this record, there was no authority to make it; and furthermore, no funds are in the possession of the appellee with which to supply the necessary contributions to build up the deficiency in the assessment fund, because it is not shown that such contract gives rise to an operating expense, as distinguished from a primary insurance contract.

After the reorganization, the Bankers Life Company was permitted to write legal reserve or level premium insurance only. When undertaking the purported estoppel agreement, it deviated from its legal field of endeavor into the prohibited realm of insurance which was not legal reserve or level premium. Thus, the statute which authorized the reorganization prohibited the estoppel agreement claimed.

Moreover, the Bankers Life is a mutual company, and there is no corporate stock. Resultantly, dividends payable to stockholders are not authorized or permitted. Whatever contributions, by way of premiums, are made by the legal reserve policyholders must be used by appellee for the purposes of that particular insurance; otherwise, the level premium members would be compelled, through a circuitous route, to make contributions to the assessment certificate holders, contrary to their policy un-

dertakings. Therefore, if, in any event, there are more premiums than needed for legal reserve insurance, the surplus not necessary in the premises must be returned to the contributors.

Inquiry here is appropriate, to determine the manner of applying those premiums within the limitations above expressed. This question is fixed by contract and principles of equity in those states where statutory provisions do not control. *United States Life Ins. Co. v. Spinks* (Ky.), 96 S. W. 889; *Citizens' Nat. Life Ins. Co. v. Morris,* 104 Ark. 288 (148 S. W. 1019); *Equitable Life Assur. Soc. v. Hardin,* 166 Ky. 51 (178 S. W. 1155); *Mutual Ben. Life Ins. Co. v. O'Brien* (Ky.), 116 S. W. 750; 14 Ruling Case Law 850, Section 15; *Royal Tr. Co. v. Equitable Life Assur. Soc.,* 247 Fed. 437. See, also, *Gourley v. Northwestern National Life Ins. Co.,* 94 Okla. 46 (220 Pac. 645). New York state has regulated this question by statute. *Greeff v. Equitable Life Assur. Soc.,* 160 N. Y. 19 (54 N. E. 712); *Equitable Life Assur. Soc. v. Brown,* 213 U. S. 25.

Provisions contained in appellee's legal reserve and level premium policy, relating to dividends, are as follows:

"After the first policy year, upon payment in cash of the premium for the second policy year, and at the end of the second and each subsequent policy year, this policy, while in force (except as extended insurance), shall be credited with its portion of the divisible surplus as annually determined by the company. * * *"

"Divisible surplus," under this policy, must be determined in Iowa by appellee through the exercise of legal discretion, as distinguished from the absolute right in that regard permitted by the New York legislation referred to. An analysis of the fundamental purpose of premiums will determine the principal elements fixing the limits of such discretion. That is to say, the underlying reason for these premiums is to: First, pay death losses under the level premium or legal reserve insurance; second, establish and maintain the necessary reserves therefor; third, meet operating expenses, including managerial, rents, taxes, advertising, agency, and miscellaneous items; and fourth, fortify against emergencies, such as epidemics and financial crises. *United States Life Ins. Co. v. Spinks,* supra, and other cases

above cited. See, also, *Pyle v. National Life Assn. of Des Moines,* 186 Iowa 756.

Said itemization is intended for illustration, rather than completeness; but in general, it shows the broad boundaries beyond which appellees cannot go in the expenditure of premiums. Unless, then, we can classify the alleged estoppel liability as an operating expense, the premiums of the legal reserve policyholders cannot be appropriated therefor by appellee; because the net remainder of its premiums, after accomplishing the purposes above catalogued, amount to and are "divisible surplus," under the policy agreement, which must be returned to the policyholders. "Operating expense" is too narrow in its scope to include any sum or sums paid out for assessment member death losses under this record. Rather, this operating cost relates to such liabilities as would necessarily rise out of the transaction of level premium and legal reserve business (as to whether or not, under any circumstances, this expenditure may be extended to cover the operating outlay of the entire company, we do not now decide). Deficits existing in the funds from which assessment certificate death losses are to be paid do not and cannot amount to and be an operating expense contributed to by the premiums of the legal reserve policyholders, within the purview of the pleadings and evidence here presented. Were it otherwise, "operating expenses" would be enlarged far beyond their ordinary meaning, so as to be crowded out of their existence as an auxiliary purpose and forced into the field of the corporation's primary object, and there be co-ordinate with, rather than subservient to, the insurance itself. Eliminating these legal reserve premiums, appellee has no source from which to pay assessment member death losses (unless it be by drawing upon the funds, reserves, and properties hereafter to be discussed), except through the assessment of that membership.

Even if appellee, as a corporation, is estopped from denying the alleged contract to thus spread the assessment over the entire membership, nevertheless appellants can obtain no practical benefits therefrom, because there are no resources with which to perform such *ultra vires* agreement. We do not now decide whether or not, under other circumstances, the contributions here claimed by the certificate holders from the policyholders could amount to and be an operating expense.

1074

IX. Remaining, then, to be considered by us are the questions relating to appellee's accounting for the guarantee, contingent, and other funds.

Appellants urge that the assessments complained of are illegal because they were not made in reference to the moneys rightfully belonging to those funds. To put the thought in another way, appellants declare that, if the proceeds of those funds wrongfully appropriated by appellee were returned to their proper place, the assessments in question would inevitably be greatly reduced. Those claims of appellants in this regard will be reviewed in the order made.

First, it is insisted by them that appellee has erroneously diminished the guarantee fund. A provision of appellee's articles of incorporation is:

"The guarantee fund shall consist of the deposits pledged by each member of the association for the prompt payment of assessments and the said deposit required of each member shall consist of the sum of one dollar for each year of the age of the member at the date of application, counted at nearest birthday. * * *"

Embodied in a by-law, and also in the assessment certificate, is the following condition:

"Upon the failure of any member to pay any assessment or expense dues within the time and at the place required, his membership shall be thereby forfeited and his right to any share or interest in the funds or property of the association, including his guarantee deposit, shall cease absolutely at the expiration of the time stipulated in which such payments are required to be made and all payments made are thereby forfeited to the association without action on its part. * * *"

Then, consistent with the foregoing, there is another clause, to this effect:

"That the guarantee deposit forfeited to the association by lapsed members shall go to the reserve fund (emergency reserve fund)."

The appellants seek to make application of this forfeiture

provision to the assessment members who transferred to the legal reserve or level premium plan after the reorganization. Each member thus exchanging and appellee mutually agreed upon the following propositions: First, cancellation of the assessment certificate; second, issuance of the new policy without medical examination at a premium rate figured on the basis of the member's age at that time; and third, transfer of the individual member's portion of the guarantee fund for the protection of his premium payments, under the terms that, if such member died in good standing, his beneficiary under the policy would receive the guarantee deposit, just the same as his beneficiary under the old assessment certificate would otherwise have done; but, in the event there was a failure upon the part of such member to pay his premium when due, this guarantee sum was to be forfeited and transferred to the certificate (not policy) holders, and there used for the reduction of their assessments.

Did that manipulation amount to a forfeiture or lapse of the assessment certificate within the terms thereof, as embodied therein, under the articles of incorporation and by-laws before mentioned? We think not. Rather than a forfeiture or lapse of the assessment certificate, there was a legal cancellation thereof by the reciprocal action of the appellee, on the one hand, and the transposing member, on the other. It is generally recognized that the right ordinarily exists to cancel a certificate or policy of insurance by mutual consent. 32 Corpus Juris 1243, Section 426; *Grand Lodge Brotherhood of Railway Trainmen v. Martin* (Tex. Civ. App.), 218 S. W. 40; *Peacock v. Our Home Life Ins. Co.*, 73 Fla. 1207 (75 So. 799); *Reliance Life Ins. Co. v. Russell*, 208 Ala. 559 (94 So. 748). See, also, *Hicks v. Northwestern Mut. Life Ins. Co.*, 166 Iowa 532. For application of the same principle to other insurance policies generally, see *Artificial Ice Co. v. Reciprocal Exchange*, 192 Iowa 1133; *Ocean Acc. & Guar. Corp. v. Meek*, 61 Utah 426 (215 Pac. 810); *Addia v. Globe & Rutgers Fire Ins. Co.*, 97 W. Va. 443 (125 S. E. 161); *Talge Mahogany Co. v. Burrows*, 82 Ind. App. 253 (143 N. E. 692). Apt language in *Ocean Acc. & Guar. Corp. v. Meek*, supra, is:

"In view of that [the cancellation by mutual consent], but one conclusion is permissible under the law, and that is that, upon the cancellation, becoming effective, both parties were re-

leased from all the covenants, obligations, and provisions of the contract, and their rights with respect thereto were as though the contract had never been entered into.''

Clearly, that must be true if there was in fact a cancellation consummated. Exchange, under the method here employed, amounted to and was a cancellation of the assessment certificate and the issuance of the new policy in lieu thereof. After that transaction, there was no assessment certificate in existence. Consequently, dues and assessments could no longer accrue thereunder. An essential prerequisite for such demands is the existence of a living, active assessment certificate. Without the latter, there can be no dues and assessments. When there are no dues and assessments, there could be no forfeiture or lapse for the want of payment thereof. Existing assessment certificate holders had no other or greater right in the guarantee fund than that the same should be held to assure the payment of assessments and dues that might in the future be owing from the individual member under his certificate. If all such assessments and dues were paid by that member, the fund never belonged to appellants, but remained the property of the depositor; and upon his death while he was in good standing, it went to his beneficiary. So, when the certificate for which the guarantee fund was placed became a nullity through cancellation, there was no further need or reason for said fund, because there could be no additional assessments or dues thereunder; and such trust money automatically became the property of the member who first deposited it. He, in turn, after the ending of his certificate contractual obligation, had a right to again enter the same money, if he so chose, under the policy agreement, to be dealt with in any manner or way agreed upon between him and appellee. About this appellants had no right to complain, for they were not concerned in that private transaction.

X. Was there anything under the peculiar circumstances of this case that would change such general rule? Nothing appears in the act authorizing the corporation's reorganization, to cause the application of any different doctrine. Hence, if there is an obstacle to the application of the principle here involved, it is because many, rather than a few, took advantage of the oppor-

tunity afforded them to cancel their respective certificates and receive policies.

Precedent for this scheme of transfer can be found in the practice of other similar institutions under like circumstances. Reference is here made to *Wright v. Minnesota Mut. Life Ins. Co.*, supra; *Dresser v. Hartford Life Ins. Co.*, 80 Conn. 681 (70 Atl. 39); *Delaney v. Grand Lodge A. O. U. W.*, 244 Mass. 556 (138 N. E. 918). While those authorities do not expressly approve of the wholesale contract exchange, yet they furnish illustrations of the fact that other institutions have employed that system without judicial condemnation. In view of the fact that the individual member, acting at a time when no one else acts, can legally enter into this compact of transfer, there does not seem to be any good reason why he cannot do the same thing at another moment, even though then there may be several, separate and alone, entering into similar individual and independent exchange undertakings.

Until rights of appellants intervened, it was entirely a matter which concerned appellee and the negotiating member only. The number engaged in the transfer, then, was not the criterion for the authorization thereof, but rather, the existence or nonexistence of vested rights held by appellants. Evidently they had no equities preventing the cancellation of a membership certificate. Contractual obligations did not afford them an advantage to that extent. No detriment befalls these certificate holders through that act on the part of appellee and the member making the substitution. The interest of appellants is best served by the transfer, for through the diminution of membership thus brought about there are fewer left (about 60,000 remained) to draw upon the death benefit funds. Wherefore, that fund will endure longer for their protection.

Demonstration of this truth is found in the fact that appellants up to the year 1927 were actually benefited by these exchanges, to the extent of $1,688,718. That came about in this way: Had the transferred certificate members remained such, their death losses would have cost appellants and those similarly situated the amount named, over and above the sum which in that event would have been paid by way of additional assessments. Difference in the ages of those actually transferred and the membership retaining their certificates was very slight. Material

variation does not appear. Increased assessments are due to the multiplying years of appellants and their associates, rather than the decreased number (through the transfer aforesaid) of assessment members, who were of a like or similar age. Under any given age, experience teaches the death rate is a certain number per thousand. Adding other thousands of the same age will not change the rate. Some unfortunate certificate member must bear the loss which is sure to come because the assessment was not sufficient in the first instance to pay the cost of the insurance. Appellee can be no respecter of persons in this regard, but must act impartially for the good of all.

Complaint of appellants cannot be justly founded upon the proposition that their share of this final burden is cast upon them, rather than another. Justice prompts the declaration that no existing certificate holder has the right to demand that another must remain, under the circumstances, to endure a system of insurance unstable and unsound, when the opportunity was presented for standard protection under the level premium or legal reserve policy. All had an equal chance to transfer to this level premium or legal reserve system of insurance. Said option was extended to appellants, as well as the rest. They were free to make their choice, and after having done so, cannot now complain because others selected more wisely. Therefore, appellants have no vested rights in the premises, and appellee had the authority to mutually agree with certain certificate holders for the cancellation of the contract; and when that was completed, the guarantee fund belonged to the individual making the original deposit.

Thus appellants have no claim thereon, and the assessment cannot be minimized by the use of that portion of the guarantee fund.

XI. At the time of the reorganization, appellee had in its contingent fund approximately $352,000 accumulated from time to time by expense assessments on the certificate members. Griev-ance is predicated by appellants on the theory that appellee improperly used this money thus collected, to defray the operating expense of the corporation, incurred not only for the certificate members, but also for the policyholders. Concession is made by appellee that this was done originally, but it explains that, in a

short time, expense money was received from the policyholders through premiums, which was used for the benefit of the contributors and the certificate members as well. This contribution by the policyholders soon became very extensive, and amounted to many times the sum used from the contingent fund aforesaid, or any other additions thereto made by the certificate holders.

Preponderance of the equities, therefore, is in favor of the policyholders, rather than the assessment members; for the latter gained by the transaction, while the former lost. Due to that situation, there is no basis for interference by a court of equity in behalf of appellants.

XII. Through excessive expense charges, appellants claim that they and their associates, since the reorganization, have been deprived of approximately $3,396,548.56. Unfair allocation of the managerial costs between the two memberships is offered by appellants as the cause for this deficit.

Chief among the matters of dispute in this regard is the appellee's practice of dividing the operating charges according to the number of policies and certificates outstanding. Opposing the handling of the matter in that way, appellants demand that the apportionment of costs above mentioned be made to correspond with the amount of insurance (whether the same be old line or assessment) held by each member. Support of that contention is founded very largely upon the testimony of appellants' witness Mr. Eddy, who gave his opinion as to the fairness and desirability of the distribution claimed by them. However, this expert admitted that other experienced men, equally skilled, fairminded, and sound in judgment, might, with the same candor, favor appellee's system of allotment. As a matter of fact, the record discloses that appellee's expert witnesses McConney, Wolfe, and Moir did so. They gave many reasons why the division of this operating cost should be made according to the number of policies and certificates, rather than the amount of insurance. The principal basis, however, for their conclusions was that the outlay for handling this coverage is as much for one policy or certificate as for another, regardless of the amount involved. Neither fraud nor mere arbitrariness on the part of appellee in connection with this allocation is proven by appellants.

Accordingly, under the evidence, the subject is one for managerial discretion, rather than court interference. *Siegman*

1080

*v. Electric Vehicle Co.,* 140 Fed. 117; *Bergman Clay Mfg. Co. v. Bergman,* 73 Wash. 144 (131 Pac. 485); *McKee v. Chautauqua Assembly,* 130 Fed. 536; *Hunt v. American Grocery Co.,* 80 Fed. 70; *Ellerman v. Chicago Junction R. & U. S. Y. Co.,* 49 N. J. Eq. 217 (23 Atl. 287); *Chambers v. McKee & Bros.,* 185 Pa. St. 105 (39 Atl. 822); *Fowler v. Sovereign Camp, W. of W.,* 106 Neb. 192 (183 N. W. 550). See, also, *Ross v. Modern Brotherhood of America,* 120 Iowa 692, and *Wright v. Minnesota Mut. Life Ins. Co.,* supra. Appropriate language in *Siegman v. Electric Vehicle Co.,* supra, is:

"The purely discretionary powers of a board of directors concerning the internal affairs of their corporation, fairly and honestly exercised, are not reviewable or controllable by the courts of law or equity. A board of directors is elected by the stockholders of a corporation for the very purpose of managing its affairs, and in so doing, so long as they act in good faith, and strictly *intra vires,* it is their judgment, and not that of its stockholders outside of the board of directors, or of any court, that is to shape its policies or decide upon its corporate acts."

Equally applicable is the following quotation from *Ross v. Modern Brotherhood of Am.,* supra:

"A mutual association of this kind is for the benefit of a great number, and its affairs must be conducted for the greatest good of the greatest number, and its internal affairs must, of necessity, be governed very largely by its proper officers, without interference by the courts * * *."

Likewise, in the case at bar, we cannot interfere with the conduct of appellee's governing board, because it appears that they acted *intra vires,* and were at all times prompted and controlled by the honest desire to do right concerning the membership involved. According to the record, disbursements for procuring new business were charged to and borne by the legal reserve policyholders. Thus it is evident that the operating expense so allocated was for legitimate charges only.

XIII. It is also maintained by appellants that they were prejudiced by appellee's handling of the investment expense charge. Deduction for that item made by appellee was one sixth of one per cent from 1912 to 1917, inclusive, and one fourth of

one per cent thereafter, from the gross rate of interest received on moneys loaned for the corporation.

Because the by-laws provided for the contingent fund before discussed, appellants argue that the investment costs should have been paid therefrom, and that the deduction charge here under consideration was unnecessary and unjust. Disclosure is made, however, that, for a number of years, the contingent fund was not sufficient to pay the general expenses chargeable to it. Consequently, it was necessary to obtain the loan or investment revenues from some other source. Expert advice, as well as the experience of other companies, is to the effect that the action of appellee in the premises was the usual, ordinary, and most widely approved. Appellee's officers, in making the "investment expense charge," were acting within the scope of their authority, without fraud or arbitrariness, in doing that which, in their honest judgment, seemed best for the corporation and its members. Their managerial discretion at that juncture cannot be interfered with by us. See authorities above cited.

XIV. No doubt the property, moneys, and funds held and owned by appellee at the time of the reorganization were accumulated by and belonged to the assessment certificate members. Those items, in the aggregate, as a matter of fact, amounted to millions of dollars. Throughout the years, this money, these funds, and that property were, according to the record, all fully and judiciously applied by appellee exclusively to the minimization of the assessments collected from appellants and their associates. Had it not been for such application of these resources, those assessments would have been much higher during the preceding years; and the present status of the assessments was brought about by the exhaustion of said holdings in making possible the past reduction of the insurance cost to each certificate holder. Rather than suffering, therefore, through the manipulation of the funds after the reorganization, appellants have benefited, as before explained; and in addition thereto, they have actually received thousands of dollars from the policyholders through the operation of By-law 11, which, together with other contributions, fully replenished all funds temporarily used for the policyholders.

XV. These several funds were not improperly handled, and there appears no reason why the assessment calls sought to

be enjoined should not be collected from appellants and their associates, and the district court was right in denying the injunction, for, as we said in *Tusant v. Grand Lodge A. O. U. W.*, 192 Iowa 1232, supra:

"Assessments sufficient in number and amount to pay current death losses may be made. If, for the purpose of such call, it should become necessary hereafter to increase the number or amount of the assessments, the defendants would have such power."

This burden appears harsh, yet, as stated in *Delaney v. Grand Lodge A. O. U. W.*, supra:

"The apparent hardship upon such of the plaintiffs as are somewhat advanced in years is disposed of by what is said in the *Reynolds* case, 192 Mass. 150, at pages 158, 159. These members 'have had the benefit of insurance for themselves and their families for many years, at very much less than the cost of their insurance to the corporation. They have had the good fortune to survive, and therefore their contracts have brought them no money, but all the time they have had the stipulated security against the risk of death. If now they are called upon to pay for future insurance no more than its cost to the corporation, they ought not to think it unjust.' "

See, also, *Supreme Lodge, K. of P. v. Mims*, supra.

Suggestion is made to the effect that the assessment members have been awarded no allowance for the so-called going value or good will of the original company at the time the reorganization took place. But we have before us no evidence of such value, and therefore we are unable to decide or fix the same.

Therefore, the judgment and decree of the district court should be, and hereby is, affirmed.—*Affirmed.*

EVANS, STEVENS, DE GRAFF, MORLING, and WAGNER, JJ., concur.

ALBERT, C. J., and FAVILLE, J., dissent.